UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE, | Civil Action No. 23-0928 (DLF) |
| Defendant, | |
| RESOLUTION COPPER MINING, LLC, | |
| Intervenor. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................. iii

Background ........................................................................................................................... 1

    I.      The Southeast Arizona Land Exchange and Conservation Act of 2013 ................ 1

    II.    The Forest Service's Contracted Appraisal and Role in the Approval Process ...... 3

    III.   Plaintiff's FOIA Request and FOIA Complaint. ................................................... 6

Legal Standards ................................................................................................................... 7

Argument ............................................................................................................................. 10

    I.      The Forest Service Performed A Reasonable Search ........................................... 10

    II.    Neither the Appraisal nor the Data Upon Which the Appraisal is Based are
          Agency Records ................................................................................................... 14

    III.   The Forest Service Properly Withheld Information Under FOIA Exemption 4 ... 17

          A.    All of the Withheld Information at Issue Here is "Commercial
                Information." ........................................................................................ 17

          B.    All Information Withheld Under Exemption 4 Was Obtained from a
                "Person." ............................................................................................... 20

          C.    All Information Withheld Under Exemption 4 Is Customarily and Actually
                Treated as Confidential. ....................................................................... 21

          D.    The Agency Need Not Demonstrate that the Withheld Information Was
                Provided Under an Assurance of Privacy ............................................. 25

          E.    Disclosure of Confidential Commercial Information Would Lead to
                Foreseeable Harm. ............................................................................... 26

    IV.   The Forest Service Properly Withheld Information Under FOIA Exemption 5 ... 30

          A.    The Withheld Information Is Inter-Agency Communication Protected by
                FOIA Exemption 5 ............................................................................... 31

          B.    The Withheld Information Is Covered by the Deliberative Process
                Privilege as Predecisional ..................................................................... 32

C.      The Withheld Information Is Covered by the Deliberative Process
        Privilege as Deliberative ......................................................................... 35

D.      The Forest Service Has Established that Disclosure of the Withheld
        Records Will Cause Foreseeable Harm. ................................................... 37

V.      The Forest Service Produced All Segregable Information ................................... 40

Conclusion ............................................................................................................................. 42

# TABLE OF AUTHORITIES

Cases ...................................................................................................................... Page(s)

*100Reporters LLC v. Dep't of Just.*,
   248 F. Supp. 3d 115 (D.D.C. 2017) .................................................................. 27

*Access Reps. v. Dep't of Just.*,
   926 F.2d 1192 (D.C. Cir. 1991) ....................................................................... 33

*Agrama v. IRS*,
   282 F. Supp. 3d 264 (D.D.C. 2017) .................................................................. 40

*Allnet Commc'n Servs., Inc. v. FCC*,
   800 F. Supp. 984 (D.D.C. 1992) ...................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................... 7

*Animals v. Nat'l Insts. of Health*,
   543 F. Supp. 2d 83 (D.D.C. 2008) .................................................................... 21

*Apache Stronghold v. United States*,
   101 F.4th 1036 (9th Cir. 2014) ........................................................................... 2

*Baker & Hostetler LLP v. Dep't of,*
   *Com.*, 473 F.3d 312 (D.C. Cir. 2006) ............................................................... 18

*Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*,
   627 F.2d 392 (D.C. Cir. 1980) ................................................................... 17, 20

*Boyd v. Crim. Div.*,
   475 F.3d 381 (D.C. Cir. 2007) ......................................................................... 41

*Brayton v. Off. of U.S. Trade,*
   *Rep.*, 641 F.3d 521 (D.C. Cir. 2011) ................................................................. 8

*Burka v. Department of Health & Human Services*,
   87 F.3d 508 (D.C. Cir. 1996) ........................................................................... 14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................... 7

*Citizens for Resp. & Ethics in Wash. ("Crew") v. Dep't of Labor*,
   478 F. Supp. 2d 77 (D.D.C. 2007) ................................................................. 8, 9

*Clemente v. FBI*,
   867 F.3d 111 (D.C. Cir. 2017) ......................................................................... 10

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ............................................................. 33, 36, 38

*Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (2021) ............................................................................... 35, 37, 38

*Consumer Fed'n of Am. v. Dep't of Agric.*,
   455 F.3d 283 (D.C. Cir. 2006) ......................................................................... 14

*Ctr. for Auto Safety v. Dep't of Treasury*,
   133 F. Supp. 3d 109 (D.D.C. 2015) .................................................................. 20

*Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) .................................................................... 26

*Defenders of Wildlife v. Dep't of Interior*,
   314 F. Supp. 2d 1 (D.D.C. 2004) ...................................................................... 11

*Defenders of Wildlife v. U.S. Border Patrol*,
623 F. Supp. 2d 83 (D.D.C. 2009) ................................................................... 8, 11

*Dep't of Health & Hum. Servs.*,
975 F. Supp. 2d 81 (D.D.C. 2013) ........................................................................ 19

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .............................................................................. 30, 31, 32

*Dep't of Just. v. Julian*,
486 U.S. 1 n.1 (1988) ............................................................................................ 31

*Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ........................................................................................ 9, 14

*Donatos Sarras v. Dep't of Just.*,
Civ. A. No. 19-0861 (CRC), 2021 WL 9909763 (D.D.C. Aug. 5, 2021) .................... 39, 40

*EPA v. Mink*,
410 U.S. 73 (1973) ........................................................................................ 31, 39

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
592 U.S. 261 (2021) .................................................................................... passim

*Food Marketing Institute v. Argus Leader Media*,
588 U.S. 427 (2019) ............................................................................ 21, 22, 25, 26

*Forest Cnty. Potawatomi Cmty. v. Zinke*,
278 F. Supp. 3d 181 (D.C. Cir. 2017) ............................................................. 14, 16

*Frontier Found. v. Dep't of Just.*,
739 F.3d 1 (D.C. Cir. 2014) .................................................................................. 33

*Gallant v. Nat'l Lab. Rels. Bd.*,
26 F.3d 168 (D.C. Cir. 1994) .................................................................................. 9

*Greenberg v. Dep't of Treasury*,
10 F. Supp. 2d 3 (D.D.C. 1998) ............................................................................ 10

*Greenspan v. Bd. of Governors of Fed. Reserve Sys.*,
643 F. Supp. 3d 176 (D.D.C. 2022) ..................................................................... 30

*Ground Saucer Watch, Inc. v. CIA*,
692 F.2d 770 (D.C. Cir. 1981) ............................................................................... 8

*Gulf & W. Indus. v. United States*,
615 F.2d 527 (D.C. Cir. 1979) ......................................................................... 20, 21

*Info. Corp. v. Dep't of Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ....................................................................... 32, 38

*Info. Ctr. v. Dep't of Just.*,
320 F. Supp. 3d 110 (D.D.C. 2018) ...................................................................... 36

*Jones & Co., Inc. v. Gen. Servs. Admin.*,
714 F. Supp. 35 (D.D.C. 1989) ............................................................................. 15

*Jud. Watch, Inc. v. Dep't of*,
*Def.*, 847 F.3d 735 (D.C. Cir. 2017) ..................................................................... 34

*Jud. Watch, Inc. v. Dep't of State*,
306 F. Supp. 3d 97 (D.D.C. 2018) ........................................................................ 30

*Jud. Watch, Inc. v. Rossotti*,
285 F. Supp. 2d 17 (D.D.C. 2003) ........................................................................ 10

*Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
20 F. Supp. 3d 247 (D.D.C. 2014) .......................................................................... 8

*Judicial Watch, Inc. v. Department of Justice*,
   20 F.4th 49 (D.C. Cir. 2021) ................................................................................. 35
*Kahn v. Fed. Motor Carrier Safety Admin.*,
   648 F. Supp. 2d 31 (D.D.C. 2009) ......................................................................... 18
*Kowalczyk v. Dep't of Just.*,
   73 F.3d 386 (D.C. Cir. 1996) ................................................................................. 11
*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ................................................................................. 8
*Leopold v. Dep't of Just.*,
   Civ. A. No. 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021) ............................ 27, 28
*Machado Amadis v. Dep't of State*,
   971 F.3d 364 (D.C. Cir. 2020) .................................................................... 31, 32, 35
*Marks v. Dep't of Just.*,
   578 F.2d 261 (9th Cir. 1978) ................................................................................. 11
*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) ............................................................................... 8
*Mead Data Cent., Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ........................................................................... 9, 40
*Media Rsch. Ctr. v. Dep't of Just.*,
   818 F. Supp. 2d 131 (D.D.C. 2011) .......................................................................... 8
*Military Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) .............................................................................. 8, 9
*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ................................................................................. 19
*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ............................................................................... 30, 32, 33
*Nat'l Parks & Conservation Ass'n v. Morton*,
   498 F.2d 765 (D.C. Cir. 1974) ............................................................................... 26
*Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*,
   216 F.3d 1180 (D.C. Cir. 2000) ............................................................................... 9
*Nat'l Treasury Emps. Union v. U.S. Customs Serv.*,
   802 F.2d 525 (D.C. Cir. 1986) ................................................................................. 9
*Nat'l Wildlife Fed. v. U.S. Forest Serv.*,
   861 F.2d 1114 (9th Cir. 1988) ............................................................................... 36
*Oglesby v. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) ........................................................................... 10, 11
*People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.*,
   901 F.3d 343 (D.C. Cir. 2018) ............................................................................... 28
*Perrin v. United States*,
   444 U.S. 37 (1979) ............................................................................................. 22
*Perry v. Block*,
   684 F.2d 121 (D.C. Cir. 1982) ............................................................................... 10
*Pub. Citizen Health Rsch. Grp. v. FDA*,
   704 F.2d 1280 (D.C. Cir. 1983) ................................................................... 17, 18, 20
*Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*,
   575 F. Supp. 3d 34 (D.D.C. 2021) .......................................................................... 38

*Renegotiation Bd. v. Grumman Aircraft*,
   421 U.S. 168 (1975) ............................................................................................ 32, 35

*Renewable Fuels Assoc. v. EPA*,
   Civ. A. No. 18-2031 (JEB), 2021 WL 602913 (D.D.C. Feb. 16, 2021) ............................ 25, 26

*Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*,
   878 F.3d 1258 (10th Cir. 2018) ................................................................................... 17

*S. All. for Clean Energy v. Dep't of Energy*,
   853 F. Supp. 2d 60 (D.D.C. 2012) .............................................................................. 21

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) .............................................................................. 8, 10

*Schlefer v. United States*,
   702 F.2d 233 (D.C. Cir. 1983) ................................................................................... 37

*Senate of the Commonwealth of P.R. v. Dep't of Just.*,
   823 F.2d 574 (D.C. Cir. 1987) ................................................................................... 37

*Spirko v. U.S. Postal Serv.*,
   147 F.3d 992 (D.C. Cir. 1998) .................................................................................... 9

*Summers v. Dep't of Just.*,
   140 F.3d 1077 (D.C. Cir. 1998) ................................................................................. 41

*Tax Analysts v. IRS*,
   152 F. Supp. 2d 1 (D.D.C. 2001) .............................................................................. 33

*Truitt v. Dep't of State*,
   897 F.2d 540 (D.C. Cir. 1990) ................................................................................... 10

*United States v. Torres*,
   115 F.3d 1033 (D.C. Cir. 1997) ................................................................................. 26

*Valencia-Lucena v. U.S. Coast Guard*,
   180 F.3d 321 (D.C. Cir. 1999) ................................................................................... 10

*Vaughn v. Rosen*,
   484 F.2d 820 (D.C. Cir. 1973) .................................................................................... 9

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ................................................................................. 35

Wash. Post Co. v. Dep't of Health & Human Servs.,
   690 F.2d 252 (D.C. Cir. 1982) ................................................................................... 17

*Wilson v. FCC*,
   Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) .......................... 20

*Wolfe v. Dep't of Health & Hum. Servs.*,
   839 F.2d 768 (D.C. Cir. 1988) ................................................................................... 36

*Worthington Compressors, Inc. v. Costle*,
   662 F.2d 45 (D.C. Cir. 1981) ..................................................................................... 27

*WP Co. LLC v. Small Bus. Admin.*,
   Civ. A. No. 20-1240 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5, 2020) ............................. 17

Statutes

5 U.S.C. § 552(a)(4)(B) ......................................................................................... 9, 14

5 U.S.C. § 552(a)(8)(A) ............................................................................................ 26

5 U.S.C. § 552(a)(8)(A)(i) ........................................................................................ 37

5 U.S.C. § 552(b) .................................................................................................. 9, 40

5 U.S.C. § 552(b)(4) ................................................................................................ 17

5 U.S.C. § 552(b)(5) ........................................................................................... 30, 31

5 U.S.C. § 551(1) ..................................................................................................... 31

16 U.S.C. § 539p(a) ................................................................................................... 2

16 U.S.C. § 539p(c)(3)(A) .......................................................................................... 3

16 U.S.C. § 539p(c)(3)(B) .......................................................................................... 3

16 U.S.C. § 539p(c)(4) ........................................................................................... 3, 4

16 U.S.C. § 539p(c)(9)(B) .......................................................................................... 3

42 U.S.C. § 4321 ........................................................................................................ 3

Pub. L. No. 113-291 ................................................................................................... 1

Rules

Fed. R. Civ. P. 56(a) .................................................................................................. 7

Regulations

36 C.F.R. § 254.4 ................................................................................................... 5, 6

In this Freedom of Information Act ("FOIA") case, Plaintiff requests records related to the appraisal of land to be exchanged by statute between the federal government and a private mining company, Resolution Copper, LLC ("Resolution Copper"). Specifically, Plaintiff submitted two FOIA requests to Defendant, the United States Forest Service ("Forest Service" or "Agency") on November 22, 2022 and March 29, 2023, seeking records that (1) the contracted appraiser submitted to the Forest Service on which its final report will be based and (2) documenting the contracted appraiser's completed work provided to the Forest Service for the Oak Flat appraisal, respectively.

As demonstrated below, the Forest Service has fully and properly responded to Plaintiff's FOIA requests pursuant to its obligations under FOIA. The Forest Service completed an adequate search and gathered all responsive records within its control and, after review, released all reasonably segregable, non-exempt records to Plaintiff. The Forest Service withheld only information the release of which would trigger foreseeable harm to the interests protected under FOIA Exemptions 4, 5, and 6.[1] Thus, the Forest Service is entitled to summary judgment.

## BACKGROUND

### I.    The Southeast Arizona Land Exchange and Conservation Act of 2013.

In 2014, Congress passed, and the President signed federal land exchange legislation that directs the exchange of land between the United States and Resolution Copper, LLC ("Resolution Copper"), a private mining company. *See* Pub. L. No. 113-291, 128 Stat. 3292 (2014); Declaration of Margret Scofield ("Scofield Decl.") ¶ 4; Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt.") ¶ 1. Specifically, the land exchange statute provides that "if Resolution Copper offers to

---

[1]    Plaintiff does not challenge the Agency's application of Exemption 6 withholdings in this case. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 3.

convey to the United States, all right, title, and interest of Resolution Copper" in certain "non-Federal land," then "the Secretary [of Agriculture ("Secretary")] is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(a).

The "Federal land," described in the statute comprises of approximately 2,422 acres of federally owned land in Pinal County, Arizona, and includes most notably a sacred site for the San Carlos Apache Tribe, commonly known as "Oak Flat," located within the Tonto National Forest. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044–46 (9th Cir. 2014); Scofield Decl. ¶ 4; Def.'s Stmt. ¶¶ 2–3. Underneath the surface of this sacred land and at near what is known as the "Copper Triangle," sits the third-largest known copper deposit in the world—two billion tons of "copper resource." *Apache Stronghold*, 101 F.4th at 1044–46; Scofield Decl. ¶ 4; Def.'s Stmt. ¶ 3.

The legislation describes "non-Federal land" to include land "necessary to equalize the land exchange." *Id.* § 539p(b). But the two parcels of land need to be of equal value. Under the statute, "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land," the exchange could be equalized by other means, including cash payment, conveyance of additional non-Federal land, or a combination of the two." *Id.* § 539p(c)(5)(B); *see* Scofield Decl. ¶ 9. And, to further help facilitate the land exchange, Congress waived the Federal Land Policy and Management Act of 1976's cash equalization limit of twenty-five percent to allow for more cash supplementation should the parcels of land be found to not be equal in value. *See* 16 U.S.C. § 539p(c)(5)(B)(ii); Scofield Decl. ¶ 9.

Recognizing the sanctity of the land involved in the land exchange to the San Carlos Apache Tribe, Congress included a provision under the law that directs the Secretary to "engage

in government-to-government consultation with affected Indian tribes" to address concerns "related to the land exchange." 16 U.S.C. § 539p(c)(3)(A); Scofield Decl. ¶ 5. The statute also requires the Secretary of Agriculture to work with Resolution Copper to address the Western Apache Indian Tribe's concerns and to mitigate any possible "adverse effects on the affected Indian tribes." 16 U.S.C. § 539p(c)(3)(B); Scofield Decl. ¶ 5. Moreover, Congress has also required that the land exchange be governed by the National Environmental Policy Act ("Policy Act"), 42 U.S.C. § 4321 *et seq.*, which requires that an environmental impact statement be prepared before the Secretary can execute the land exchange. 16 U.S.C. § 539p(c)(9)(B); Scofield Decl. ¶ 5. Once a Final Environment Impact Statement ("Final Statement") is prepared according to the Policy Act review process, the Secretary has no more than sixty days to "convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." *Id.* § 539p(c)(10); Scofield Decl. ¶ 5. A Final Statement, however, will not be completed until the Tribal consultation process is complete. *See* Scofield Decl. ¶ 5; Def.'s Stmt. ¶ 24.

## II.    The Forest Service's Contracted Appraisal and Role in the Approval Process.

As directed by Congress, to equalize the value of the land exchange, Congress required the parcels of land subject to the land exchange to be independently appraised. *See* 16 U.S.C. § 539p(c)(4); Scofield Decl. ¶ 6; Def.'s Stmt. ¶ 5. To obtain an independent appraisal, the Forest Service and specifically its Southwest Regional Office, which manages in part the federal land being exchanged, entered Contract No. 12837120C0041 for Appraisals Services supporting the land exchange (the "Contract") with Weissenborn Appraisal LLC ("Appraiser") on May 26, 2020. *See id.* The Forest Service refers to the land exchange and its work on that exchange as the Resolution Copper Project and Land Exchange ("Resolution Copper Project"). *See* Def.'s Stmt. ¶ 4. The lead contracted appraiser ("Lead Appraiser") is Barry Weissenborn. *See* Scofield Decl.

¶ 6; Def.'s Stmt.¶ 6.   The Review Appraiser for the Forest Service, also referred to as "Chief Appraiser," is Gerald Sanchez.   *See id.*

To date, Sanchez is the only Forest Service employee who has been authorized to view the final report of the appraisal (the "Appraisal") and the underlying data and information supporting it.   *See* Def.'s Stmt. ¶ 7.   He is also one of only three Forest Service employees who are contractually permitted to receive information about the assignment, appraisal results, or portions thereof.   *See id.* ¶ 8.   Contractually, the Appraisal may be released to Resolution Copper and the Forest Service after the Appraisal is reviewed and approved by the Secretary.   *See id.* ¶ 10.   But the unauthorized release of the Appraisal prior to the completion of this review will invalidate its use—to provide the basis of value for the legislated land exchange.   *See id.*

After being granted permission to view the underlying data and information on which the Appraisal was based, Sanchez began to prepare a technical review of the results of the Appraisal as required by Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisition.   *See id.* ¶ 11.   Sanchez viewed the underlying data and information on which the Appraisal was based, via a virtual electronic vault paid for by the Appraiser.   *See id.* ¶¶ 51–52.   The Appraiser could track what Sanchez was viewing and for how long.   *See id.* ¶ 52.   Most importantly, Sanchez could not electronically copy any information he viewed in the vault.   *See id.* ¶ 53.   And when required to discuss this information with the Appraiser, all communications took place via Microsoft Teams call and were not recorded.   *See id.* ¶ 53.

Eventually, on January 20, 2023, the Appraiser completed the Appraisal and, on January 22, 2023, "provided" it to the Forest Service, meaning that Sanchez was granted authorization to view it.   *See id.* ¶ 12.   On January 25, 2023, Sanchez completed the technical review of the results of the Appraisal and issued a Technical Appraisal Review Report.   *See id.* ¶ 13.

The Technical Appraisal Review Report is a comprehensive assessment of the completeness and accuracy of the Appraisal, which also ensures that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data. *See id.* ¶ 14. In addition, Sanchez also prepared an Appraisal Report Summary, summarizing the appraisal concerning the value of land to be exchanged, and to meet the statutory requirement that the Secretary share either the approved Appraisal or a summary thereof before the land exchange is consummated. *See id.* ¶ 15. Both documents were prepared to assist the Secretary when making his decision to accept the Appraisal and move forward with the land exchange. *See id.* ¶ 20.

To date, however, no one other than Sanchez, and those needed to prepare the two reports to respond to Plaintiff's FOIA requests, have viewed the full Technical Appraisal Review Report and the Appraisal Report Summary. *See id.* ¶ 21. Eventually, both documents will be submitted up the chain of review to the Secretary. *See id.* ¶¶ 25, 27. At present, however, the review process of the Appraisal has not begun and, thus, the Secretary has not yet received a copy of the Appraisal, a summary thereof, or a copy of the Technical Appraisal Review Report. *See id.* ¶¶ 25–27. The reason for this is twofold.

First, approving the Appraisal too early may result in the unnecessary delay of having to update the Appraisal or complete an entirely new Appraisal before the land exchange is complete. *See id.* ¶ 27. Under the statute, the Secretary must conduct a new appraisal or update current one three years after the Appraisal is approved, unless the Forest Service and Resolution Copper reach an exchange agreement—a non-binding document that outlines the responsibilities of both parties to a land exchange, *see* 36 C.F.R. § 254.4—before then. *See* 16 U.S.C. §539p(c)(4)(B)(ii); Def.'s Stmt. ¶ 28. Because information gathered from the Tribal consultation process, however, is often

part of the considerations included in the exchange agreement between parties, such agreement is unlikely to be entered into until that Tribal consultation process is complete. *See* Def.'s Stmt. ¶ 29. Thus, to avoid any delay necessitated by the need to complete a new or updated appraisal if an exchange agreement is not reached within three years of the Appraisal's approval, the Secretary will not begin this approval process until at least the Tribal consultation process is complete. *See* Scofield Decl. ¶ 12.

Second, the Secretary has not begun the review process to approve the Appraisal, as updates to the Appraisal, along with the Technical Appraisal Review Report and Appraisal Report Summary, may still need to be made after the Tribal consultation process is completed and the Final Statement is issued. *See* Def.'s Stmt. ¶ 30. This is because if the consultation process or the Final Statement results in a mutual agreement to reconfigure the parcels of land to be exchanged, then an updated Appraisal may need to be completed to account for that reconfiguration. *See id.* For this reason, again, the Secretary will not begin the review process for approving the Appraisal until after the Tribal consultation process and Final Statement is complete. *See id.*

**III.    Plaintiff's FOIA Requests and FOIA Complaint.**

On November 22, 2022, Plaintiff submitted a FOIA request to the Forest Service seeking the following records:

> [T]he records that document the information submitted to the Forest Service by the aforementioned contracted appraiser(s). This refers to the information or data from your contractor upon which your final report will be based.

*Id.* ¶ 31. Although the request was received by the Southwest Region al FOIA Service Center, it was forwarded first to Washington D.C. Office for processing before returned to the Southwest Regional Office. *See id.* ¶¶ 32–36. In the meantime, on March 29, 2023, Plaintiff submitted a second FOIA request seeking:

The records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat appraisal.

*Id.* ¶ 37.

After completing a search for all responsive records, on April 17, 2024, the Forest Service produced to Plaintiff a copy of the Technical Appraisal Review Report and Appraisal Report Summary with partial redactions to protect material exempt pursuant to FOIA Exemptions 4, 5, and 6. *See id.* ¶¶ 38–39.

Meanwhile, Plaintiff filed its initial complaint in this case on April 5, 2023, and later amended it on June 29, 2023. *See* Compl., ECF No. 1; Am. Compl., ECF No. 13. On April 19, 2024, the parties represented that Plaintiff does not contest the Forest Service's withholdings of Exemption 6 material but challenges the Forest Service's search for responsive records and application of Exemptions 4, and 5. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 31. Accordingly, the current motion will only focus on defending the Forest Service's invocation of FOIA Exemptions 4 and 5 to protect the withheld information.

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is up to the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. A genuine issue is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

An agency is entitled to summary judgment if it shows that "it has fully discharged its obligations under . . . FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev*, 20 F. Supp. 3d 247, 253 (D.D.C. 2014). FOIA requires that an agency

release responsive information unless it is protected from disclosure by one or more of the Act's

nine exemptions.  *See* 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51

(1989).  The agency bears the burden of demonstrating that any withheld information falls into

one or more of those exemptions.  5 U.S.C. § 552(a)(4)(B); *Nat. Res. Def. Council, Inc. v. Nuclear*

*Regul. Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).  An agency may meet its burden to

establish the applicability of an exemption by providing a *Vaughn* index or declaration that

"permit[s] adequate adversary testing of the agency's claimed right to an exemption."  *Nat'l*

*Treasury Emps. Union v. U.S. Customs Serv*., 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead*

*Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977), and *Vaughn v. Rosen*,

484 F.2d 820, 828 (D.C. Cir. 1973)). The supporting documentation must contain "an adequate

description of the records" and "a plain statement of the exemptions relied upon to withhold each

record."  *Nat'l Treasury Emps.*, 802 F.2d at 527 n.9.

Although a *Vaughn* index is a common device used by agencies to meet their burden of

proof, "the Court may award summary judgment solely on the basis of information provided by

the department or agency in declarations when the declarations describe 'the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith.'"  *CREW*, 478 F. Supp. 2d at 80

(quoting *Military Audit Project*, 656 F.2d at 738); *see Spirko v. U.S. Postal Serv*., 147 F.3d 992,

998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing

similar information can suffice.") (citing *Gallant v. Nat'l Lab. Rels. Bd.*, 26 F.3d 168, 172-73 (D.C.

Cir. 1994)).

Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under FOIA and the FOIA claim is moot. *See Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982).

## ARGUMENT

The parties have conferred, and Plaintiff has agreed not to challenge any of the invocations of Exemption 6 to protect personally identifying information. Plaintiff therefore challenges the Agency's search for responsive records and its withholdings of certain information contained the Technical Appraisal Review Report and Appraisal Report Summary. Each challenge is discussed below.

## I.    The Forest Service Performed A Reasonable Search

An agency is entitled to summary judgement in a FOIA case with respect to the adequacy of its search if it shows "'that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce information requested.'" *Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017) (quoting *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs.*, 926 F.2d at 1201; *see Jud. Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured"). It is appropriate for an agency to search for responsive records in accordance with the manner in which its records systems are indexed. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998). FOIA does not require that an agency search every division or field office on its

own initiative in response to a FOIA request if responsive records are likely to be located in a particular place. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996); *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978). Nor does FOIA require that an agency search every record system. *Oglesby*, 920 F.2d at 68.

Where an agency affidavit attests that a reasonable search was conducted, the agency is entitled to a presumption of good faith. *Defenders of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004). "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). Applying these principles, the Forest Service is entitled to summary judgment with respect to the adequacy of its search.

Here, there is no material doubt that the Forest Service performed an adequate and reasonable search in response to Plaintiff's two FOIA requests because its search was reasonably calculated to uncover all relevant documents. As the Scofiled declaration explained in detail, the Agency searched all locations reasonably believed to contain responsive records. In response to Plaitniff's first request—which seeks "the records that document the information submitted to the Forest Service by the aforementioend contracted appraiser(s)," including "the information or data from your contracor upon which your final report will be based"—the Forest Service assigned it to Sanchez, the Chief Appraiser for the Resolution Copper Project, the only custodian reasonably believed to have responsive records. Scofield Decl. ¶ 18; Def.'s Stmt. ¶¶ 31, 35, 41. Indeed, Sanchez is the only Forest Service employee who has seen a copy of the Appraisal and has access to view the underlying data and information on which it is based. *See* Def.'s Stmt. ¶ 7. However, when Mr. Sanchez received the request in January 2023, Mr. Sanchez replied that while he had access to the Appraisal and the underlrying supporting data and information, he had no records

responsive to Plaintiff's first FOIA request. *See* Scofield Decl. ¶ 19–21; Def.'s Stmt. ¶ 34–36, 42. According to both Sanchez and the Director of Lands and Minerals for the Southwest Region of the Forest Service ("Regional Land Director"), the Agency does not have possession of the Appraisal or any data submitted to form the basis for the Appraisal because those documents are in the Appraiser's possession. *See* Scofield Decl. ¶¶ 18, 32; Def.'s Stmt. ¶ 38, 43. Sanchez further suggested that the request should remain with the Southwest Regional Office of the Forest Service, as it was the official record holder for the Resolution Copper Project. *See* Scofield Decl. ¶¶ 21–22; Def.'s Stmt. ¶ 36. In March 2023, Plaintiff's November 2022 request was then transferred back to the Southwest Regional Office for procesisng. *See* Def.'s Stmt. ¶ 36.

Meanwhile, Plaintiff submitted a second FOIA request for the "records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat appraisal." *See id.* ¶ 37. The Southwest Regional Office searched all locations at the Southwest Regional Office reasonably believed to contain responsive records to both of Plaitniff's FOIA requests. *See* Scofield Decl. ¶¶ 26–29; Def.'s Stmt. ¶ 38, 44. Specifically, the Director of Lands and Minerals for the Southwest Region, Tracy Parker, searched his emails using the search terms, "Resolution Copper" and "Oak Flats Appraisal," but found no responsive documents. *See* Scofield Decl. ¶ 27; Def.'s Stmt. ¶ 45. This finding, however, is entirely consistent with the fact that Sanchez is the only Forest Service Employee who has been authorized to view the Appraisal and the supporting data and information, and any conversations about the Appraisal and the data used in the Appraisal were done via Microsoft Teams Phone calls, not via email, and the calls which were not recorded by the Forest Service. *See* Def.'s Stmt. ¶¶ 7–10, 43, 52–56.

Parker then searched the only other location reasonably believed to contain documents responsive to Plaintiff's two FOIA requests—a restricted Pinyon (Box) folder for the Resolution

Copper Project, accessible only by Parker and Sanchez.    *See* Scofield Decl. ¶ 28; Def.'s Stmt.

¶ 46.    Per standard practice, this electronic folder is the official repository of any documents that

the Forest Service created or retained for the Resolution Copper Project.  *See* Scofield Decl. ¶ 28;

Def.'s Stmt. ¶ 47.  From there, Parker recovered two records responsive to Plaintiff's request: the

Technical Appraisal Review Report and the Appraisal Report Summary.  *See* Scofield Decl. ¶ 28;

Def.'s Stmt. ¶ 48.   Again, this result is consistent with the fact that while Sanchez had been

approved to view the Appraisal and its supporting data and information, all of those records are

maintained in the Appraiser's custody only, pursuant to the Appraiser's contract with the Forest

Service.  *See* Def.'s Stmt. ¶¶ 9–10, 43, 51–54.

       Notably, no other custodians were asked to search for responsive records because there not

a need to do so.  *See* Scofield Decl. ¶ 29; Def.'s Stmt. ¶ 49.   According to Parker, he and Sanchez

were the only two Forest Service employees involved in the land exchange during the timeframe

that the Appraisal was being completed and up to the time of the search for responsive records.

*See id.*  Although one other Regional Appraiser for the Forest Service was previously involved in

the land exchange and authorized to receive information about the Appraisal from the Appraiser,

Parker confirmed that the former Regional Appraiser would not have had any responsive records

as he no longer worked for the Forest Service at the time the Appraisal was completed and because

none of the information or data from the Appraiser underlying the Appraisal was conveyed to the

Forest Service other than through unrecorded Microsoft Teams calls.  *See* Scofield Decl. ¶ 50;

Def.s Stmt. ¶ 50.

       Thus, these facts show  the Forest Service searched all locations reasonably believed to

have responsive records. The Court should enter judgment the Forest Service's favor on the

adequacy of the search issue.

## II.    Neither the Appraisal nor the Data Upon Which the Appraisal is Based are Agency Records

FOIA applies only to "agency records[.]" 5 U.S.C. § 552(a)(4)(B). FOIA but does not define the term "agency record" in either its text or in its legislative history, *see Tax Analysts*, 492 U.S. at 142. The Supreme Court has held that documents constitute "agency records" subject to FOIA if they are (1) created or obtained by an agency, and (2) in the agency's control. *Id.* at 144-46. Thus, to be considered an "agency record," a document must have been both created or obtained by an agency and in the agency's control.

Whether an agency controlled the record at the time of a FOIA request, depends on the "'totality of the circumstances test' to determine whether documents are 'agency records.'" *Forest Cnty. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181 (D.C. Cir. 2017) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). In *Burka v. Department of Health & Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996), the court examined four factors in determining whether an agency controls a record or document: (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record or system of files. *Burka*, 87 F.3d at 515. As shown below, the Forest Service does not "control" the Appraisal or it supporting data because the Appraiser has retained complete control over those records, the Agency cannot use and dispose of the records as it sees fit. Moreover, the extent to which Agency personnel have read or relied on the records is extremely limited, and the records are not integrated the data into the Forest Service's files.

First, in storing the Appraisal and its supporting data in its virtual vault, called Digify, for which the Appraiser pays to keep records securely stored, and limits who has access to view those

records, the Appraiser has indicated his intention to retain exclusive control over the records and underlying information. *See* Def.'s Stmt. ¶ 7, 51; *Jones & Co., Inc. v. Gen. Servs. Admin.*, 714 F. Supp. 35, 38, 39 (D.D.C. 1989) ("[M]aintenance of the list in a locked safe and his granting of very limited access are indicative of his intention to retain close personal control over the list at all times."). Here, Sanchez was the only person from the Forest Service who was given access to view the Appraisal and its data. *See* Def.'s Smt. ¶ 7. To view these records, Sanchez was given his own password, by which the Appraiser could use to track what Sanchez was viewing in the vault and for how long. *See id.* ¶ 52. This shows that the Appraiser maintains complete control of the Appraisal and the data, even though it gives Sanchez periodic access to the information.

Second, because of the Appraiser maintains the Appraisal and its data upon in such a secure vault, the Agency cannot use and dispose of the records as it sees fit. Although permitted to view the Appraisal when necessary, Sanchez was unable to print it, screenshot it, forward it, or take any sort of action where he could remove the actual document or the information contained in the document from the virtual vault. *See id.* ¶ 53. Likewise, all communications between Sanchez and the Appraiser regarding the Appraisal and its data was conducted via Microsoft Teams calls only, and not by any other media (such as messages) that could be saved and disposed of at the will by the Forest Service. *See id.* ¶ 55. Indeed, until the Appraisal is approved, the Contract prohibits the Appraiser from releasing it to the Forest Service. *See id.* ¶ 10.

Third, consistent with the Appraiser's contractual requirements, the Appraiser further limits the extent to which Forest Service personnel have access to read or rely upon the document. *See id.* ¶ 9. Under the contract, "information about the assignment, appraisal results, or portions thereof" can be conveyed "only to the Contracting Officer, Forest Service Review Appraiser, or Chief Appraiser." *See id.* And here, only Sanchez, who was named as both the Forest Service

Review Appraiser and Chief Appraiser in the contract, had permission to review the Appraisal for Agency use. *See id.* ¶¶ 7–8. Because Sanchez' access to read and rely upon the Appraisal was so restricted, it took the majority of 2022 for Sanchez to draft the Technical Appraisal Review Report and the subsequent Summary Review Appraisal—the two documents upon which the Secretary will rely to assist with his decision on whether to approve the Appraisal. *See id.* ¶¶ 11, 15, 20, 56. And until the Final Statement and Tribal Consultation process is complete, these documents will not be shared with anyone else. *See id.* ¶ 23.

Fourth, neither the Appraisal nor any of the underlying data or information was imported into the Forest Service's Pinyon folder for the Resolution Copper Project—the official repository in which any documents that the Forest Service created or retained for the Resolution Copper Project is stored. *See* Scofield Decl. ¶30; Def.'s Stmt. ¶¶ 46–47, 54.

Given that none of the *Burka* factors evidencing agency control are present here, the Court should find that the Appraisal and its supporting data are not agency records over which the Forest Service had control at the time it completed its search. *See Zinke*, 278 F. Supp. 3d at 195-96 (finding third party contractor records not agency records despite fact that that agency created or obtained records where it exercised supervision and control over collection and analysis of data because control factors did not demonstrate that defendant controlled records).

As a final matter, to the extent Plaintiff may argue that, at some point in the future, the Forest Service may have access to the Appraisal and its underlying, this argument is irrelevant. As the Tenth Circuit has aptly pointed out, "it does not matter that the Forest Service could possess the documents by requesting them from [the contractor]: a federal right of access does not render a private organization's data 'agency records' subject to FOIA, because 'FOIA applies to records

which have been in fact obtained, and not to records which merely could have been obtained.'"

*See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 878 F.3d 1258, 1263 (10th Cir. 2018).

**III.    The Forest Service Properly Withheld Information Under FOIA Exemption 4**

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privilege or confidential." 5 U.S.C. § 552(b)(4). As Congress explained, this exemption is meant to protect information "which would customarily not be released to the public by the person from whom it was obtained" such as "business sales statistics" and "customer lists." *See* S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965).  Courts in this Circuit have distilled Exemption 4 into a three-part test where information is protected from disclosure if it is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *WP Co. LLC v. Small Bus. Admin.*, Civ. A. No. 20-1240 (JEB), 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  As demonstrated below, the Forest Service properly applied this exemption to withhold certain information contained in the Technical Appraisal Review Report and the Appraisal Report Summary which contain submitters' confidential commercial information. Such information, moreover, was obtained from a person and is customarily and actually treated as confidential.  Likewise, its disclosure would cause foreseeable harm to the submitters' interests protected by Exemption 4.

**A.    All of the Withheld Information at Issue Here is "Commercial Information."**

The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings." *Pub. Citizen*, 704 F.2d at 1290 (citing Wash. Post Co. v. Dep't of Health & Human Servs., 690 F.2d 252, 266 (D.C. Cir. 1982), and *Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 403 (D.C. Cir. 1980)). "[R]ecords that actually reveal basic commercial operations, such as sales statistics, profits and

losses, and inventories, or relate to the income-producing aspects of a business" contain "commercial" information. *Pub. Citizen*, 704 F.2d at 1290. However, "Exemption 4 is not confined only to records that 'reveal basic commercial operations . . . or relate to the income producing aspects of a business.'" *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (emphasis is original). Indeed, "the question of whether information is 'commercial' boils down to a commonsense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Pub. Citizen*, 704 F.2d at 1290 (describing manufacturers' interest in the documentation of the health and safety experience of their products as a clear "commercial interest")).

Here, the Forest Service has identified that the information withheld in its Technical Appraisal Review Report and the Appraisal Report Summary under Exemption 4 was obtained from three different sources, each of which have a business interest in the protected information. *See* Def.'s Decl. ¶¶ 57–59. These sources include (1) experts in the minerals field and providers of reports sold only to those in the mining and appraisal industries, (2) Resolution Copper, and (3) the Appraiser. *See id.* ¶ 59.

First, the information provided by mineral experts and providers of mining reports are commercial in nature because they contain assessments of the strength of various mineral deposits and their effects on the real estate market for parcels of land containing those deposits. *See* Scofield Decl. ¶ 48; Def.'s Stmt. ¶ 64. This information procured from mineral experts and mining reports include: the names of providers, such as consulting geologist, and their summaries of confidential and propriety technical reports and data; the number of international projects analyzed; the geographic locations, descriptions, metal content, property rights, and financing

terms of selected comparable sales; direct sales comparison sales summary table; the results of independent studies; concentrate transport costs; metal recovery information; treatment and refining cost information; metal pricing information; royalty (net smelter return) information and royalty calculation table information; and discount rate information. *See id.* ¶ 65. The real estate market is "by its nature," a "commercial enterprise." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). Moreover, information relating to the effects on the real estate market is commercial "in its function," as the mineral experts and providers of mining reports sell their work product for profit. *See id.*

Second, the information provided by Resolution Copper is also commercial because it comprises the Appraiser's descriptions of and inferences from information about how Resolution Copper operates its business, such as how it uses its land, the intricacies of its smelting processes, project timelines, transportation costs, and cash flows. *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶ 69; *Pub. Citizen Health Rsch. Grp. v. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 105 (D.D.C. 2013) (finding information related to business-related processes, decisions, and conduct to be "sufficiently commercial" to benefit from Exemption 4). Specifically, this includes the information in the Technical Appraisal Review Report and the Appraisal Report Summary described as: "resource classification; deposit size and estimated billions of pounds; zoning use; orebody specific parameters; and project delay information." Def.'s Stmt. ¶ 70.

The remaining information that the Forest Service withheld under Exemption 4 derived from the Appraiser includes (1) the Appraiser's own opinions regarding the market value of the parcels of land subject to appraisal and (2) the Appraiser's forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales. *See* Scofield Decl. ¶ 52; Def.'s Stmt. ¶¶ 75. Both categories of withheld information are commercial in nature

as they relate, again, to the market and commercial value of the parcels of land subject to appraisal and comparable sales. *See* Def.'s Stmt. ¶ 76; *Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL 4245485, at *7 (D.D.C. Sept. 15, 2022) (finding that withheld documents concerning "the market value and proposed sale prices for various broadcast stations, negotiations and possible structures for divestiture deals, and discussions surrounding the planned Sinclair-Tribune transaction" fit "snugly within the 'ordinary meanings' of the terms 'commercial' and 'financial'") (citing *Pub. Citizen*, 704 F.2d at 1290). Accordingly, the Forest Service properly determined that the withheld information constitutes "commercial information" under FOIA Exemption 4.

**B.    All Information Withheld Under Exemption 4 Was Obtained from a "Person."**

Exemption 4 also requires that the information be obtained from a "person," which covers "a wide range of entities including corporations, associations and public or private organizations other than agencies." *Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992). In determining whether information is "obtained from a person," the D.C. Circuit has taken a plain language approach that focuses on whether the information at issue originated outside the federal agency. *See Bd. of Trade*, 627 F.2d at 404 (finding that information is considered "obtained from a person" if the information originated from an individual, corporation, or other entity, and so long as the information did not originate within the federal government). Similarly, information that was supplied to the government by a "person" outside of government is considered "obtained from a person" for purposes of Exemption 4, even when that information appears in Department generated documents. *See Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979) (finding that information submitted to the government and then incorporated into Agency documents was "obtained from a person" for purposes of Exemption 4); *Ctr. for Auto Safety v. Dep't of Treasury*, 133 F. Supp. 3d 109, 123 (D.D.C. 2015) (holding that "[i]nformation originally

obtained from an outside source, but later included in Agency documents, may be considered 'obtained from a person'" and qualify for Exemption 4 protection). The key inquiry is who "the source of the information [was] in the first instance," and not who created the document. *Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 103 (D.D.C. 2008)

Here, the information withheld pursuant to Exemption 4 meets the "obtained from a person" criteria as it was gathered and developed from "persons" outside of government. Specifically, as just described, the withheld information was gathered by the Appraiser from three difference sources outside the government, including (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser. *See* Def.'s Stmt. ¶ 59. That the Appraiser included this information gathered from non-government sources, "in the first instance," in the Appraisal and then Sanchez included it in the Technical Appraisal Review Report and Appraisal Summary Report, thereafter, does not change the fact that the information satisfies the criterion of being obtained from a person. *See* Scofield Decl. ¶ 55; Def.'s Stmt. ¶¶ 17–18; 57–58; *Def. of Animals*, 543 F. Supp. 2d at 103; *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (holding that even "information in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information." (citing *Gulf & W. Indus.*, 615 F.2d at 529–30 (protecting contractor information contained in agency audit report))). Accordingly, Exemption 4 clearly covers information obtained (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser because they are "persons" for purposes of Exemption 4.

## C. All Information Withheld Under Exemption 4 Is Customarily and Actually Treated as Confidential.

The key consideration in evaluating the application of Exemption 4 is "confidential[ity]." In *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), the Supreme Court held

that the term "confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" at the time the statute was enacted in 1966 and that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" 588 U.S. at 433 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The Court observed that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . and '[t]hose exemptions are as much part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirements.'. . . So just as we cannot properly expand Exemption 4 beyond what its terms permit, we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms." *Argus Leader*, 588 U.S. at 439 (citations omitted, alterations and emphasis in original). In *Argus Leader*, the Supreme Court held that, to qualify as "confidential," the information must be customarily and actually kept private, or at least closely held. *See id.* at 434. As the Court explained, it would be "hard to see how information could be deemed confidential if its owner shares it freely." *Id.*; *see also Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (holding "commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained.").

Here, all information withheld under Exemption 4 is confidential information because it is customarily and actually kept closely held. First, regarding information gathered from mineral expert assessments and providers mining reports, to protect its commercial value, this information is not available publicly. *See* Scofield Decl. ¶ 49; Def.'s Stmt. ¶ 66. Indeed, these assessments from mineral experts and providers of mining reports are the very business from which these sources make their profit and cannot be publicly released without undermining the providers' own business viability. *See* Scofield Decl. ¶ 49; Def.'s Stmt. 67. Thus, this information can and is

obtained for payment by appraisers, but not without customary assurances that the information purchased will be protected under confidentiality agreements and not made publicly available.  *See* Scofield Decl. ¶ 49; Def.'s stmt. ¶ 66.

Likewise, when the Appraiser purchased information from mineral experts and mining reports, he did so only after providing assurances that the assessments from mineral experts and mining reports would be kept confidential by both the Appraiser, and the intended users of the Appraisal to the full extent possible under law.  *See* Def.'s Smt. ¶ 59–61, 66.  To that end, the Appraiser, as described above, has kept the Appraisal and all underlying data and information supporting it, very tightly secured in an electronic vault to which only one employee at the Forest Service has access.  *See id.* ¶¶ 7, 51.  As contractually required, moreover, the Appraiser has labeled confidential and closely held information from providers in the Appraisal, so that they may be protected to the full extent under law.  *See* Scofield Decl. ¶ 47, 7; Def.'s Stmt. ¶ 62.  Not only is the entire Appraisal as confidential, but at multiple points, the Appraisal includes the statement:

> This is a CONFIDENTIAL REPORT, possession of this report, or a copy thereof, does not carry with it the right of publication.  It may not be used for any purpose by any person other than the party to whom it is addressed without prior written consent of the appraiser[.]

Def.'s Stmt. ¶ 62.

Similarly, to protect this same provider information from the Appraisal in the Summary Review Appraisal and the Technical Appraisal Review Report, the unredacted versions of two documents are secured in a password protected Pinyon box with the Forest Service, accessible by only Sanchez and Parker until the appropriate time the documents will be shared with the Secretary to assist with his decision to approve the Appraisal.  *See* Def.'s Stmt. ¶¶ 46, 48.  And before releasing the redacted versions in this case, the Forest Service conferred with the Appraisal to

ensure that all such confidential provider information was properly redacted as such. *See id.* ¶¶ 57–58.

Similarly, regarding information gathered from Resolution Copper, the Appraiser confirmed that such information gleaned from Resolution Copper is not part of current public disclosure made by Resolution Copper. *See id.* ¶ 72. It is also actually kept confidential as the Appraiser was not able to obtain this information without providing assurances of confidentiality to Resolution Copper. *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶¶ 60–61. And as described above, to keep this information confidential, the Appraiser has kept the Appraisal and all underlying data and information tightly secured in an electronic vault with notice on the Appraisal that the report and specific parts thereof are confidential. *See id.* ¶¶ 51, 62. The Forest Service, in turn, has protected the unredacted versions of the Technical Appraisal Review Report and Summary Review Appraisal in a password protected Pinyon box, and before releasing redacted versions of the same, conferred with the Appraisal to determine which part of those documents reflect the information derived from Resolution Copper that was included first in the Appraisal and is confidential. *See id.* ¶¶ 46–48, 57–58.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales are kept confidential. Indeed, it is very clear that none of the Appraiser's opinions regarding the market value of the parcels of land in the exchange has been made public, yet, given that this appraisal value has not yet even been approved by the Secretary. *See id.* ¶¶ 10, 26, 78. And as indicated, the Appraiser and Forest Service are taking every precaution to ensure that such information is kept confidential pending approval of the Appraisal by the Secretary. *See id.* ¶¶ 9–10, 46, 48; *see also* Scofield Decl. ¶¶ 10, 53. Likewise,

the Appraiser's own assessment of comparable sales is also kept confidential because this information, like information from mineral experts and mining reports, is the result of the Appraiser's own professional knowledge, and thus the Appraiser's developed forecast model can be used in products sold to other clients. *See* Scofield Decl. ¶ 54. This information is thus not made readily available to the public but can be purchased by clients under assurances of confidentiality. *See id.*; Def.'s Stmt. ¶¶ 66, 81. Therefore, when identifying that this information is confidential in the Appraisal, the Appraiser noted that any re-articulation of the same information in the Technological Appraisal Review Report and the Summary Review Report should be kept protected as well. *See* Def.'s Stmt. ¶ 82.

D.    **The Agency Need Not Demonstrate that the Withheld Information Was Provided Under an Assurance of Privacy**

The Court in *Argus Leader* questioned whether, in some instances, it might be possible for "privately held information [to] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]" 588 U.S. at 434–435 (emphasis in original). The Supreme Court had no need to resolve that question, however, because it was clear in *Argus Leader* that such assurances had been made. *Id.* In the cases that have been decided since, none have held that the absence of an assurance of privacy is, in and of itself, sufficient to defeat an Exemption 4 assertion. *Renewable Fuels Assoc. v. EPA*, Civ. A. No. 18-2031 (JEB), 2021 WL 602913, at *7 (D.D.C. Feb. 16, 2021) ("[N]o court has yet held that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances." (quoting *Argus Leader*, 588 U.S. at 434)).

"The current law of the D.C. Circuit, which remains binding authority, is that information is confidential under Exemption 4 'if it is of a kind that would customarily not be released to the

public by the person [or entity] from whom it was obtained.'" *Renewable Fuels*, 2021 WL 602913, at \*7 (quoting *Critical Mass*, 975 F.2d at 879); *see also Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019) ("*Critical Mass* and its progeny . . . supply the framework."). "Were this Court to hold that the information is not confidential because a second necessary condition exists that is not met here, it would essentially be overruling [*Critical Mass*] or at least declining to faithfully apply it." *Renewable Fuels*, 2021 WL 602913, at \*7. "Absent a Supreme Court holding squarely abrogating Circuit precedent—which [*Argus Leader*] clearly is not—this Court has no power to depart from the result mandated by that precedent." *Id.* (citing *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)). Thus, under the controlling authority in this Circuit, to establish confidentiality, the Agency need only demonstrate that the information was customarily and actually treated as private—as it has already shown above.

### E.   Disclosure of Confidential Commercial Information Would Lead to Foreseeable Harm.

Under the FOIA Improvement Act, an agency is permitted to withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption; or (II) disclosure is prohibited by law[.]"  5 U.S.C. § 552(a)(8)(A).  "To meet this requirement, the defendants must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing 'genuine harm to [the submitter's] economic or business interest.'" *Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113 (quoting *Argus Leader*, 588 U.S. at 443, and citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974)).  "The FOIA Improvement Act's 'foreseeable harm' requirement replaces to some extent the 'substantial competitive harm' test that the Supreme Court overruled in [*Argus Leader*]." *Id.*  Caselaw that addresses the "substantial competitive harm" test prior to *Argus Leader*, may therefore be

instructive.  At that time, the D.C. Circuit followed the general principle that "'competition in business turns on the relative costs and opportunities faced by members of the same industry,' and thus, 'there is a potential windfall for competitors to whom valuable information is released under FOIA.'"  *100Reporters LLC v. Dep't of Just.*, 248 F. Supp. 3d 115, 140 (D.D.C. 2017) (citing *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981)).

Here, release of the information that Plaintiff seeks would cause serious financial and competitive harm for multiple sources whose confidential commercial information was included in the Appraisal, and now in the Technical Appraisal Review Report and the Appraisal Report Summary.  As for information from mineral experts and mining reports, the Appraiser confirmed that the public release of this information would foreseeably undermine its commercial value and affect the ability of mineral experts and providers of mining reports to make a profit form that information in the future, which in turn affects its business viability.  *See* Scofield Decl. ¶ 49. Specifically, the information, if released, could be used by competitors wishing to capitalize on a similar product to sell to clients of the providers who submitted this information, and at a lower cost that is not economically profitable for the providers who spent resources to develop those assessments in the first instance.  *See id.*; Def.'s Stmt. ¶ 67; *Leopold v. Dep't of Just.*, Civ. A. No. 19-3192 (RC), 2021 WL 124489, * 7 (D.D.C. Jan. 13, 2021) (finding that defendant met the standard of showing foreseeable harm when "[t]he release of [withheld] information could disadvantage [the submitter] and provide an unfair advantage to its competitors.").  That the Summary Review Appraisal may be released in full at some time before the land exchange is consummated, does not negate the foreseeable immediate harm on the profitability of the information currently protected as the business viability of the providers depends on this singular window of time to profit from their assessments.  *See* Scofield Decl. ¶ 50; Def.'s Stmt. ¶ 68.

Next, releasing the Appraiser's descriptions and inferences from information about how Resolution Copper operates its business could harm Resolution Copper competitively and financially. *See* Scofield Decl. ¶ 51. These descriptions and inferences, even filtered through the Appraiser, about Resolution Copper's mining operations, would build a mosaic of information regarding protected business information that is not part of current public disclosures made by Resolution Copper. *See id.* For example, even the commercial values of the proposed parcels of land may reflect commercial information about specific mining operations relative to the effectiveness of those mining operations. *See id.* Thus, disclosure of this information, to the extent it may disclose proprietary commercial information about specific mining operations may, immediately run the risk of absorption and use by competitors to Resolution Copper. *See* Def.'s Stmt. ¶ 72. These competitors, in turn, may seek to replicate Resolution Copper's operations in their own to try to see an end product at the lowest possible cost, undermining Resolution Copper's profits, which for business viability purposes, must account for resource and development expenditures of those operations that competitors now need not expend. *See id.*; *People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.*, 901 F.3d 343, 354 (D.C. Cir. 2018) (agreeing with the agency that disclosing the airline carriers and transport routes used by private importers would provide an unfair "windfall" to competitors who could thereby "enter the market without the startup costs associated with researching successful importation means and practices"). Likewise, earlier disclosure of this information prior to the Appraisal's approval by the Secretary may run the risk of public misperception or misunderstanding as to the value of the Resolution Copper's business to the company's detriment, including possibly financially. *See* Def.'s Stmt. ¶ 74.

There is another foreseeable harm at issue should confidential commercial information provided to the Appraisal from mining experts, providers of mining reports, and Resolution Copper be released. Indeed, the Appraiser gathered this information under assurances of confidentiality to the providers who rely on the Appraiser's assurances and discretion. *See id.* ¶ 60. If the protected information is released, the Appraiser's own business would suffer, as providers and similar providers may decline to allow the Appraiser to avail itself of their information in the future, which would affect the Appraiser's competitive business operations and ability to provide competitive work for clients. *See id.* ¶ 63.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales, if released, would cause foreseeable financial harm to the Appraiser. First, the Appraiser's opinions as to the market value of the parcels of land subject to appraisal, if released is, at bottom, the essence of the Appraisal itself. *See* Def.'s Stmt. ¶ 79. It is this value of land which the Secretary must review and approve before the land exchange is completed. *See id.* ¶ 16. Contractually, the early release of this information, may very well invalidate its use in supporting the Agency Action. *See id.* ¶ 10. In which case, this would compromise any remaining business interest that the Appraiser may still have under the Contract with the Forest Service. *See* ¶ 79. Second, regarding the Appraiser's own assessment of comparable sales, this information, like information from mineral experts and mining reports, can be sold to other clients. *See id.* ¶ 80. But if it is released publicly, the commercial value of this information decreases, undermining the Appraiser's ability to make a profit from the information, thus harming the Appraiser's business and financial interest as explained similarly above. *See id.* ¶ 81

Because each of these concretely explain harms are "textbook articulations of foreseeable harm" for which Exemption 4 protects and the Scofield declaration articulates a "link between the specified harm and the specific information contained in the material withheld," withholding the information provided by mineral experts, providers of mining reports, Resolution Copper, and the Appraiser, under Exemption 4 was proper. *Greenspan v. Bd. of Governors of Fed. Reserve Sys.*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022).

## IV.    The Forest Service Properly Withheld Information Under FOIA Exemption 5

Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).   As a general matter, intra-agency communications are those between employees within a single executive branch agency, and inter-agency communications are between employees of different agencies or departments. *Jud. Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 109 (D.D.C. 2018) (also discussing intra-agency consultant corollary).   One well-recognized civil discovery privilege that permits agencies to withhold records under Exemption 5 is the deliberative process privilege.   *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

The deliberative process privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).   The object of the privilege is to enhance the "quality of agency decisions" by "protecting open and frank discussion among those who make [decisions] within Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (quoting *Sears*, 421 U.S. at 151).   This privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front

page news." *Klamath*, 532 U.S. at 9; *Sierra Club*, 592 U.S. at 267 (noting the privilege encourages candor among agency officials and "blunts the chilling effect that accompanies the prospect of disclosure."); *EPA v. Mink*, 410 U.S. 73, 87 (1973) (explaining that Government decision making would be greatly hampered if agencies were "prematurely forced to 'operate in a fishbowl.'") (referencing S. Rep. No. 813, at 9 (1965)).

To properly assert the deliberative process privilege under Exemption 5, the Agency must show that the contested intra or inter-agency records are both "'predecisional' and 'deliberative.'" *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). Here, the Agency has shown both.

### A.    The Withheld Information Is Inter-Agency Communication Protected by FOIA Exemption 5.

FOIA Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The FOIA statute defines "agency" as "an authority of the Government of the United States" including "any executive department," "establishment in the executive branch of the Government," or "independent regulatory agency." 5 U.S.C. §§ 551(1), 552(f). "Intra-agency" memorandum generally refers to those documents "addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9-10 (quoting *Dep't of Just. v. Julian*, 486 U.S. 1, at 18 n.1 (1988) (Scalia, J. dissenting)).

Here, the Agency withheld parts of two documents—the Technical Review Appraisal Report and the Summary Review Appraisal. *See* Def.'s Stmt. ¶¶ 39–40. The withheld information is covered under Exemption 5 as inter-agency communications because both documents were created by Sanchez for the Forest Service. *See id.* ¶ 11, 13–15, 19–20, 22, 25. Except for purposes of responding to the FOIA request at issue in this case, these documents have not been released to

anyone outside the Forest Service. *See id.* ¶¶ 21–22. Eventually, the Technical Review Appraisal Report will be shared with the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange. *See id.* ¶ 25. Likewise, the Appraisal Report Summary will be provided to the Secretary to give the Secretary the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange. *See id.* ¶¶ 18–19, 25. Until then, both documents are maintained in the Forest Service's official repository for all Agency records created or retained by the Forest Service for the Resolution Copper Project and Land Exchange files. *See id.* ¶¶ 46–48.

### B.    The Withheld Information Is Covered by the Deliberative Process Privilege as Predecisional

To qualify for protection under Exemption 5, the United States Supreme Court has held that "a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. Interpreting the second condition, the Supreme Court stated that Exemption 5 covers civil discovery privileges, including the deliberative process privilege, a form of executive privilege. *Id.* The deliberative process privilege permits the agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 150. To be covered by this privilege, the agency must show that the withheld documents are both predecisional and deliberative. *Machado, 971 F.3d at 370.*

"A document is predecisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made." *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman*

*Aircraft*, 421 U.S. 168, 184 (1975)).  The agency's categorization of a document as predecisional is not dispositive: courts should undertake a functional analysis of "whether the agency treats the document as its final view on the matter." *Sierra Club*, 592 U.S. at 268.  Predecisional documents can lose that status if adopted as the agency's final position on the matter, but the privilege still protects information that was part of the agency's "group thinking in the process of working out its policy." *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 8 (D.C. Cir. 2014); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  To show that a document is predecisional, the agency does not need to identify a specific final decision on the subject, if one exists at all, but should explain the role the contested document played in the deliberative process. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1196 (D.C. Cir. 1991); *see Sears*, 421 U.S. at 151 n.18 (noting that not all recommendations will ripen into agency decisions).

The same information that the Forest Service withheld under Exemption 4, it also withheld under Exemption 5, because the information, at bottom, reflects either the express proposed opinion of value placed on the parcels of land being exchanged, or at a minimum, information which can be compiled to discern an opinion of value on the parcels of land being exchanged, which is still being deliberated and has not yet been reviewed and approved by the Secretary.  *See id.* ¶ 83.  The purpose of this withheld information is to assist the Secretary make that very determine whether to approve the appraised value of the parcels of land being exchanged.  *See id.* ¶ 84; *see e.g. Tax Analysts v. IRS*, 152 F. Supp. 2d 1, 24-25 (D.D.C. 2001) (protecting memoranda "written by a component office without decisionmaking authority to a different component office" that had such authority), *aff'd in part, rev'd in part on other grounds & remanded*, 294 F.3d 71 (D.C. Cir. 2002).  Specifically, Sanchez authored the Technical Appraisal Review Report to provide to the Secretary the with a comprehensive assessment of the completeness and accuracy

of the Appraisal, so that the Secretary could ensure that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data as required under Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisitions. *See* Scofield Decl. ¶ 40; Def.'s Stmt. ¶ 14, 25. Likewise, Sanchez authored the Appraisal Report Summary to provide the Secretary with the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange. *See* Def.'s Stmt. ¶ 18. Likewise, because the Secretary is required, under statute, to publish a copy of either the Appraisal or a summary thereof before the land exchange is consummated, the Appraisal Report Summary will be provided to the Secretary so that he can have all the information necessary to decide whether to release the Appraisal or the summary thereof, as already drafted and for his review. *See id.* ¶ 19. Thus, the reason the Forest Service created the withheld material is consistent with it being predecisional, particularly when the Secretary has not made a decision on the Appraisal or approved the land exchange.

In addition, nothing in the record, moreover, suggests that the information withheld under Exemption 5 has lost its status as predecisional by being formally and explicitly adopted as the Agency's final decision on the matter. *Sierra Club*, 592 U.S. at 268 (finding the rationale behind the deliberative process privilege "does not apply, of course, to documents that embody a final decision, because once a decision has been made, the deliberations are done."); *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (explaining predecisional materials can lose status as such in certain cases where there is an express adoption). As Ms. Socfield explained, the Secretary has not approved the Appraisal, nor has he even received the Technical Appraisal Review Report or the Appraisal Report Summary to assist with this decision as both documents are still subject to revision. *See* Scofield Decl. ¶ 58.

**C.** **The Withheld Information Is Covered by the Deliberative Process Privilege as Deliberative**

Deliberative records are those "prepared to help the agency formulate its position," *Sierra Club,* 592 U.S. at 268, by implicating the "consultative process" including communications which reflect the "type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve" the agency's proposed policies. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 364 (2021). In short, the "key to whether a document is deliberative is whether it is part of the 'give-and-take' of the 'consultative process.'" *Id.* (quoting *Machado*, 971 F.3d at 370); *see Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) (stating that documents part of the deliberative process make recommendations or express opinions on legal or policy matters).

In order to assist court's in evaluating whether disputed records are deliberative, the D.C. Circuit in *Judicial Watch, Inc. v. Department of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021), advised agencies to explain four factors: (1) what deliberative process is involved; (2) the role played by the disputed documents in the course of that process; (3) the nature of the decision making authority vested in the person issuing the disputed document; and (4) the relative position in the agency's chain of command of the persons authoring and receiving the document.

Here, the Agency's explanation shows that the material it has withheld under Exemption 5 is deliberative. First, the deliberative process involved is the Secretary's ultimate decision whether to approve the Appraisal for the parcels of land subject to the pending land exchange. *See* Def.'s Stmt. ¶ 85. This process is plainly consistent with the Supreme Court's definition of "deliberative" communications as those "prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786; *Grumman Aircraft*, 421 U.S. at 184 (noting materials protected by the privilege are

"predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision[.]").

Next, the Technical Review Appraisal Report and the Review Summary Appraisal are the two most significant documents assisting the Secretary make that ultimate decision. *See id.* ¶ 85. The information, specifically withheld under Exemption 5 goes to the heart of the Secretary's decision, as it reflects either express proposed opinions on the values of the parcels of land being exchanged or the most relevant information from which those proposed values can be discerned. *See id.* ¶ 83. Indeed, when determining whether information protected under Exemption 5 is deliberative, the D.C. Circuit has declared that redacted information should be examined "in the light of the policies and goals that underlie" the privilege and in the "context in which the materials are used," *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988), and here, the "ultimate objective" of Exemption 5 is to safeguard agencies' deliberative process, *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988); *see also Elec. Priv. Info. Ctr. v. Dep't of Just.*, 320 F. Supp. 3d 110, 119 (D.D.C. 2018) (noting that "the selection or organization of facts can be part of an agency's deliberative process and so exempt from FOIA"). Thus, the role played by the information protected plainly falls within the course of the Forest Service's deliberative process to determine whether to approve the Appraisal of land values subject to a legislative land exchange.

In addition, the direction by which the protected pre-decisional information flows is precisely the direction that expected for protection warranted under Exemption 5. *Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional."). Here, Sanchez, who created the Technical Review Appraisal Report, and the Review Summary Appraisal is an employee of the Forest Service who was approved to review the

Appraisal and create these two documents to assist the Secretary, and other decisionmakers, assess the Appraisal's opinions regarding the value of the lands being exchanged. *See id.* ¶¶ 11, 13–15, 25. Eventually both the Technical Review Appraisal Report and the Review Summary Appraisal will be submitted up the decisional chain to the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange. *See id.* ¶ 25. Thus, the third and fourth factors that assist Courts with determining whether information is deliberative, clearly reflect the deliberative nature of the information being withheld as they show to the extent deliberative information is being considered from "subordinate" to "superior." *Senate of the Commonwealth of P.R. v. Dep.'t of Just.*, 823 F.2d 574, 586 (D.C. Cir. 1987) (referencing *Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983)).

### D. The Forest Service Has Established that Disclosure of the Withheld Records Will Cause Foreseeable Harm.

In addition to showing that specific documents qualify for protection under a named Exemption, the FOIA Improvement Act of 2016 further requires that an agency show that it (i) "reasonably foresees that disclosure would harm an interest protected by an exemption" to FOIA or (ii) "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "The foreseeable harm requirement imposes an independent and meaningful burden on agencies." *Reps. Comm.*, 3 F.4th at 369. To carry this burden, an agency withholding documents under the deliberative process privilege must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370. Agencies must explain the "particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes[,]" and must "articulate the link between the specified harm and specific

information contained in the material withheld." *Id.* at 369, 372 (referencing H.R. Rep. No. 391, at 9 (2016)).

Here, disclosure of the withheld materials will cause foreseeable harm to at least two interest protected by the deliberative process privilege: (1) public confusion of the Agency's position on controversial issues and (2) ensuring that Agency employees are able to engage in full and frank discussion. *See* Def.'s Stmt. ¶ 86; *Coastal States*, 617 F.2d at 866 (describing the purpose of the deliberative process privilege to preserve frank discussions between government officials, protect against the premature disclosure of proposed policies, and avoid public confusion from releasing inaccurate information.); *see also Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*, 575 F. Supp. 3d 34, 51–52 (D.D.C. 2021) ("[T]he D.C. Circuit has long recognized that the risk of public confusion "has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies." (citing *Petrol. Info.*, 976 F.2d at 1436 n.10)).

Here, the Secretary must approve the Appraisal and thus the value of the appraised parcels of land subject to the land exchange before any land or cash can be conveyed. *See* Def.'s Stmt. ¶ 16. And because various considerations weigh on the timing of this approval, the Secretary is not expected to begin this approval process until at least Tribal consultations and the Final Statement are completed. *See id.* ¶¶ 27–30. Thus, if the information withheld under Exemption 5 and reflecting the actual or discernible proposed value of the parcels of land being exchanged is released, this will sow confusion publicly as to whether (1) the Tribal consultation and Final Statement are completed, which they are not and (2) that proposed value is the actual approved value for the parcels of land being exchanged. *See id.* ¶ 87. The value of the land being exchange is an extremely sensitive and controversial issue. *See* Scofield Decl. ¶¶ 4–5, 10, 67, 70. As previously mentioned, the San Carlos Apache Tribe views the land being exchanged known as

Oak Flat as sacred and thus, Congress has specifically required the Forest Service to address and mitigate with Resolution Copper issues surrounding the land exchange raised by local Indian Tribes. *See id.* Thus, there is substantial potential for the public to construe the release of this information as an inaccurate representation of the Secretary's decision regarding the value of the sensitive parcels of land being exchanged.

More importantly, however, the release of information withheld under Exemption 5 in all responsive records would foreseeably harm the Forest Service's ability to complete its frank and candid consultation process with local Tribes. *See* Def.'s Stmt. ¶ 88; *Mink*, 410 U.S. at 87 (explaining that the objective of the deliberative process privilege is to protect the candor of agency decision-making which would be harmed if employees were forced to "operate in a fishbowl"); *Donatos Sarras v. Dep't of Just.*, Civ. A. No. 19-0861 (CRC), 2021 WL 9909763, at *8 (D.D.C. Aug. 5, 2021) (recognizing candor as an interest protected by Exemption 5). Currently, the Forest Service is still engaged in government-to-government discussions with local Indian Tribes regarding the land exchange. *See* Def.'s Stmt. ¶ 89. The premature release of the proposed value or discernible value of the parcels of land being exchanged may not be reflective of current government-to-government discussions regarding the intrinsic value placed on the land by these tribes. *See id.* While these considerations by Tribal members could be addressed through other terms of exchange mutually agreed upon with Resolution Copper at the time when Tribal consultations and a Final Statement is complete, the current Appraisal of the parcels of land subject to exchange by statue will not reflect those considerations. *See id.* As a result, frank and open discussions in the Tribal consultation process will be tempered or derailed until any misconceptions surrounding the premature release of the proposed value or discernible value of the parcels of land being exchanged dissipates. *See id.* This in turn will chill these discussions

and cause further delay to the completion of the land exchange. *See id.* Indeed, until these consultations are complete, neither the Final Statement, nor the Secretary's final decision to review and approve the Appraisal will be completed, and the triggering events necessary for completing the land exchange will be delayed or possibly stalled indefinitely. *See id.* ¶¶ 27–30; Scofield Decl. ¶ 14, 68.

Likewise, the Agency continues to engage in government-to-government consultation with local tribes in a variety of other matters. *See* Scofield Decl. ¶ 69–70; Def.'s Stmt. ¶ 90. Any potential negative effect on the current consultation process with the Resolution Copper Project and Land Exchange will, in turn, negatively affect the consultation process in these other matters as well, to the extent that any premature disclosure of Exemption 5 information sows discord that goes beyond the current project and leads to distrust and erosion in the Agency's government-to-government relationship with San Carlos and other tribes in the region. *See id.*

At bottom, the evidence in the record clearly shows that the foreseeable harm caused by releasing the disputed information withheld from disclosure includes the very interests protected by the deliberative process privilege of Exemption 5. The material withheld under Exemption 5 is therefore proper.

## V.     <u>The Forest Service Produced All Segregable Information</u>

While an agency may properly withhold records or parts of records under one or more FOIA exemptions, it "must release 'any reasonably segregable portions' of responsive records that do not contain exempt information.'" *Agrama v. IRS*, 282 F. Supp. 3d 264, 275 (D.D.C. 2017); *see* 5 U.S.C. § 552(b) (requiring "any reasonably segregable portion of a record shall be provided to [the requester] after deletion of the portions which are exempt"). Non-exempt portions of a document "must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data*, 566 F.2d at 260. Before approving the application of a FOIA exemption, district courts

must make specific findings of segregability regarding the material to be withheld. *Summers v. Dep't of Just.*, 140 F.3d 1077, 1081 (D.C. Cir. 1998). Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material. *Boyd v. Crim. Div.*, 475 F.3d 381, 391 (D.C. Cir. 2007).

As explained in the Scofield Declaration, the Forest Service undertook a careful page-by-page, and line-by-line analysis of the two documents produced in response to Plaintiff's FOIA request, and concluded they had released all reasonably segregable, non-exempt material. *See* Scofield Decl. ¶¶ 71–74; Def.'s Stmt. ¶ 91–92. The Forest Service further concluded that all information withheld from disclosure under Exemptions 4, 5, and 6 could not be further segregated of meaningful information in the page or portion of the pages withheld without disclosing information that warrants protection under those same three exemptions. *See id.* Moreover, all information not exempted from disclosure under the cited exemptions was correctly segregated and released. *See id.* Thus, the Forest Service has provided all non-exempt records responsive to Plaintiff's request.

\*    \*    \*

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor.

Dated: August 22, 2024                    Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____/s/ Anna D. Walker_____
    ANNA D. WALKER
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2544

*Attorneys for the United States of America*