## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, <br><br> *Defendant.* <br><br> and <br><br> RESOLUTION COPPER MINING, LLC <br><br> *Intervenor-Defendant.* | No. 23-cv-00928 (DLF) |

## <u>MEMORANDUM OPINION</u>

Before the Court are the defendant United States Forest Service's, Dkt. 35, and intervenor-defendant Resolution Copper Mining, LLC's, Dkt. 36, motions for summary judgment, and plaintiff Center for Biological Diversity's cross-motion for summary judgment, Dkt. 37.  For the reasons that follow, the Court will grant in part and deny in part each motion.

### I.    BACKGROUND

#### A.    The Land Exchange, Appraisal, and Related Documents

In 2014, Congress passed federal land exchange legislation directing a land exchange between the United States and Resolution Copper, LLC (Resolution), a private mining company. *See* Pub. L. No. 113-291, 128 Stat. 3292, 3732 (2014); Scofield Decl. ¶ 4, Dkt. 35-3; Def.'s Stmt. of Undisputed Material Facts ¶ 1, Dkt. 35-2 (Def.'s Stmt.).  The law provides that "if Resolution Copper offers to convey to the United States, all right, title, and interest" in certain "non-Federal land," then "the Secretary [of Agriculture] is authorized and directed to convey to Resolution

Copper, all right, title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(c)(1).

The "Federal land" designated under statute comprises approximately 2,422 acres in Arizona and includes a sacred site for the San Carlos Apache Tribe—commonly known as "Oak Flat"—located within the Tonto National Forest. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044–46 (9th Cir. 2014). Underneath the surface of this land sits the third-largest known copper deposit in the world—two billion tons of "copper resource." *Id.* at 1045. The "non-Federal land" is defined as land "necessary to equalize the land exchange"—meaning the land parcels must be of equivalent value. 16 U.S.C. § 539p(b)(4). But "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land," the exchange may be equalized by other means, such as cash payment, transfer of additional non-Federal land, or a combination of the two. *Id.* § 539p(c)(5)(B); *see* Scofield Decl. ¶ 9. To help facilitate the land exchange, Congress waived the Federal Land Policy and Management Act of 1976's cash equalization limit of twenty-five percent, allowing for a greater cash payment in the event that the parcels of land were found to not be equal in value. *See* 16 U.S.C. § 539p(c)(5)(B)(ii).

Congress directed the Secretary to "engage in government-to-government consultation with affected Indian tribes," to address concerns "related to the land exchange" and to mitigate any possible "adverse effects on the affected Indian tribes." 16 U.S.C. § 539p(c)(3)(A)–(B). Congress also required the land exchange be governed by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, which requires an environmental impact statement before the Secretary can execute the land exchange. 16 U.S.C. § 539p(c)(9)(B). Once a Final Environment Impact Statement is prepared according to the NEPA review process, the Secretary has no more than sixty days to "convey all right, title, and interest of the United States in and to the Federal

land to Resolution Copper." *Id.* § 539p(c)(10).  The NEPA statement will not be completed until the Tribal consultation process is complete.  *See* Scofield Decl. ¶ 5; Def.'s Stmt. ¶ 24.

To comply with the statutory equalization requirement, Congress mandated that the land parcels be independently appraised.  *See* 16 U.S.C. § 539p(c)(4).  The Forest Service contracted with Barry Weissborn to serve as lead appraiser.  Scofield Decl. ¶ 6; Def.'s Stmt.¶ 6.  Within the Forest Service, Gerald Sanchez was designated to assess the appraiser's work.  Scofield Decl. ¶ 6; Def.'s Stmt.¶ 6.  Sanchez is the only Forest Service employee authorized to view the final appraisal report and its underlying data and supporting information.  Def.'s Stmt. ¶ 7.  He is also one of only three Forest Service employees who are contractually permitted to receive information about the assignment, appraisal results, or portions thereof.  *Id.* ¶ 8.

On January 20, 2023, the appraisal was completed, and on January 22, 2023, the appraisal was "provided" to the Forest Service, meaning that Sanchez was granted authorization to view it. Def.'s Stmt ¶ 12.  Sanchez viewed the underlying data and information via a virtual electronic vault paid for by the appraiser, which Sanchez accessed with a password provided to him.  *See id.* ¶¶ 51–52.  When discussing this information with the appraiser, all communications took place via Microsoft Teams calls and were not recorded.  *See id.* ¶¶ 50, 53.

On January 25, 2023, Sanchez completed the technical review of the results of the appraisal and issued a report.  *Id.* ¶ 13.  Sanchez's technical report assessed the completeness and accuracy of the appraisal to ensure that it used appropriate methods and techniques, and that its conclusions, analyses, and opinions were reasonably supported with market data.  *Id.* ¶ 14.  Sanchez also prepared an appraisal summary.  *Id.* ¶ 15.  Both documents were prepared to assist the Secretary when deciding whether to accept the appraisal and move forward with the land exchange.  *Id.* ¶ 20.  To date, however, no one other than Sanchez—and those needed to prepare the two reports to

respond to the FOIA requests at issue in this case—have viewed full, unredacted versions of the technical report and summary. *Id.* ¶ 21. Eventually, both documents will be submitted through the agency chain of command for the Secretary's review. *Id.* ¶¶ 25, 27. That review process of the appraisal has not yet begun, so the Secretary has not yet received copies of the appraisal, appraisal summary, or technical report. *Id.* ¶¶ 25–27. Contractually, the appraisal may be released to Resolution and the Forest Service only after review and approval by the Secretary. *Id.* ¶ 10.

### B.    The Center's FOIA Requests

On November 22, 2022, the Center for Biological Diversity requested from the Forest Service "records that document the information submitted to the Forest Service by" various contract appraisers the agency was using to appraise Oak Flats. Am. Compl. ¶ 2, Dkt. 13. The Forest Service acknowledged receipt and indicated it began searching for the records on December 27, 2022. *Id.* ¶ 24.

On June 21, 2023, the Forest Service provided its "final determination" for the November 2022 request, stating the agency "does not have records relevant to the FOIA request." *Id.* ¶ 37. The Forest Service explained:

> Please be advised that the records that document the information submitted to the Forest Service by the contracted appraiser(s), is the appraisal itself, which is still in draft form. Therefore, we are providing a "no records" response for the records that document the information submitted to the Forest Service by the contracted appraiser(s). Should the draft documents be requested at this time, they would be withheld in full under (b)(5) of the FOIA as pre-decisional as we are still working through the deliberative review process with the contractors.

*Id.*

The Center filed a separate FOIA request in March 2023, requesting "the records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat

appraisal." *Id.* ¶ 38.  On June 21, 2023, the Forest Service also provided its "final determination" for the March 2023 request, stating:

> Please be advised that the work the appraiser provided to the Forest Service for the Oak Flat appraisal, as well as all related records are still in draft form.  Therefore, we are providing a "no records" response for the final report(s).  Should the draft documents be requested at this time, they would be withheld in full under (b)(5) of the FOIA as pre-decisional as we are still working through the deliberative review process with the contractors.

*Id.* ¶ 41.

The Center sent follow up questions to the Forest Service, and on September 11, 2023, the agency "agreed to run a search for records responsive to Plaintiffs' [FOIA] request," and "expect[ed] to complete that search by September 29, 2023."  Fink Decl. Ex. G, Dkt 37-5.  On October 17, 2023, the Center was informed that "the Forest Service has completed [its] search for responsive records and is currently processing those records and preparing a supplemental response," which it anticipated providing to the Center "before Thanksgiving."  Fink Decl. Ex. H. After processing those records, on April 17, 2024, the Forest Service produced a copy of the technical report and appraisal summary with partial redactions to protect material exempt pursuant to FOIA Exemptions 4, 5, and 6.  Def.'s Stmt. ¶¶ 38–39.

## II.    LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA.  *Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, a federal agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (internal quotation marks omitted). The agency "must show beyond material doubt ... that it has conducted a search reasonably calculated to uncover all relevant documents," *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983), and must also explain why any of the nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to withheld information, *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006).

"The peculiarities inherent in FOIA litigation, with the responding agencies often in sole possession of requested records and with information searches conducted only by agency personnel, have led federal courts to rely on government affidavits to determine whether the statutory obligations of the FOIA have been met." *Perry*, 684 F.2d at 126. A court may grant summary judgment based on an affidavit if it contains reasonably specific detail and neither contradictory record evidence nor evidence of bad faith calls it into question, *see Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

## III.    ANALYSIS

The parties disagree on four issues: (A) whether the appraisal is an "agency record" under FOIA; (B) whether the Forest Service properly justified its invocation of Exemption 4 to redact portions of the appraisal summary and technical report; (C) whether the Forest Service properly justified its invocation of Exemption 5 to redact portions of the appraisal summary and technical

report; and (D) whether the agency properly segregated all non-exempt and exempt information.[1]
The Court will address each issue in turn.

### A.      "Agency" Records

To begin, the parties dispute whether the appraisal and its underlying data are "agency records" under FOIA.  *Compare* Gov't Mot. for Summ. J. at 14, Dkt. 35-1, *with* Pl.'s Opp'n at 12. The "threshold inquiry in any FOIA case is whether the documents requested are in fact 'agency records.'"  *Wolfe v. HHS*, 711 F.2d 1077, 1079 (D.C. Cir. 1983).  FOIA requires federal agencies to make agency records available to the public upon reasonable request, 5 U.S.C. § 552(a)(3)(A), subject to certain statutory exemptions, *see id.* § 552(b)(1)-(9).  "[B]ut the statute does not define the term [agency records]."  *ACLU v. CIA*, 823 F.3d 655, 662 (D.C. Cir. 2016) (citations omitted). Courts have concluded that the term "agency records" refers only to those documents "that an agency both (1) creates or obtains and (2) controls at the time the FOIA request is made."  *Id.* (citing *DOJ v. Tax Analysts,* 492 U.S. 136, 144–45 (1989)) (cleaned up).  An agency bears the burden of demonstrating the materials sought are not agency records.  *Tax Analysts*, 492 U.S. at 142 n.3.

In *Burka v. HHS*, the D.C. Circuit held that an agency's "constructive control" of records suffices to satisfy both prongs of the *Tax Analysts* test, even when the records are not "currently located on agency property."  87 F.3d 508, 515 (D.C. Cir. 1996).  The court explained that "the extensive supervision and control" over a third party's creation of documents or records "indicates

---

[1] In its pleadings, the Center also challenged the adequacy of the Forest Service's search for responsive records. *See, e.g.*, Am. Compl. ¶¶ 43, 48, 51, 56.  But the Center no longer disputes that the Forest Service conducted an adequate and reasonable search in response to the FOIA requests. Opp'n at 12 n.4, Dkt. 38.  The Court will therefore grant the Forest Service summary judgment on the issue of the adequacy of its records search.  Additionally, the Center no longer challenges the Forest Service's application of Exemption 6 withholdings in this case. *See* Apr. 19, 2024, Jt. Status Rep., Dkt. 31.

that [the third party] acted on behalf of [the agency] in creating" them, thus satisfying the requirement the agency create or obtain the document for it to be considered an "agency record." *Id.* In other words, the "control" requirement can be satisfied to such a degree that the "created or obtained" requirement logically follows.[2] *Id*. "Factors that determine whether an agency controls a document include: (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." *Cause of Action Inst. v. OMB*, 10 F.4th 849, 855 (D.C. Cir. 2021) (citing *Burka*, 87 F.3d at 515). This is a "totality of the circumstances test," *Consumer Fed. of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006), but the extent to which an agency has used the document is often the "decisive factor," *Jud. Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 927–28 (D.C. Cir. 2011).

Applying the four-factor test, the Court concludes that the appraisal is an "agency record" under FOIA because the Forest Service constructively controls it. First, the appraiser did not manifest intent to retain control over the appraisal. Although the appraiser stores the appraisal and its supporting data in a virtual vault—which he pays for and maintains—to keep the records stored

---

[2] Other courts have cast doubt on *Burka*'s approach of allowing constructive control to satisfy the "created or obtained" requirement. *See, e.g.*, *Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 230 F. Supp. 3d 1245, 1248 (D. Colo. 2017) (explaining *Burka*'s approach "is highly questionable given that the Supreme Court's *Tax Analysts* decision unambiguously treats 'created or obtained' and 'control' conjunctively—'[t]wo requirements . . . each of which must be satisfied for requested materials to qualify as 'agency records''" (quoting *Tax Analysts*, 492 U.S. at 144)); *Bloomberg L.P. v. Bd. of Governors of Fed. Rsrv. Sys.*, 649 F. Supp. 2d 262, 275 (S.D.N.Y. 2009) (arguing Supreme Court precedents "do not compel adoption of the constructive obtainment and control theory," and thus "declin[ing] to do so under the facts presented"). But the D.C. Circuit explicitly conducted a *Tax Analysts* analysis in *Burka*, holding an agency's "extensive supervision and control" over a third party's creation of documents or records to satisfy the "obtained" requirement. *Burka*, 87 F.3d at 515. Accordingly, in this circuit, the "created or obtained" prong may be satisfied through constructive control of a document.

securely, Def.'s Stmt. ¶ 7, 51, the appraiser agreed in his contract to deliver both hard and electronic copies of the appraisal to the Forest Service, Scofield Decl., Ex. 1, at 28. The contract similarly instructs that "Release of the appraisals to [Resolution Copper] and [United States Forest Service] personnel will occur <u>after</u> the appraisals have been reviewed and approved." Scofield Ex. 1, at 14; Scofield Decl. ¶ 7. The agency points to a different provision, which allows the appraiser to maintain control during the deliberative appraisal review process. Scofield Decl., Ex. 2, at 2 (FOIA section). But that provision is immaterial because even if the appraisal remains with the appraiser during "deliberative appraisal review process," the agency concedes the appraisal will be released to the Forest Service after it is approved by the Secretary. *See* Gov't Mot. for Summ. J. at 15. Indeed, the appraiser will relinquish control over the records after the document is reviewed and approved.

The third factor—often the "decisive factor," *Judicial Watch, Inc.*, 646 F.3d at 927–28—also suggests constructive agency control. The record shows that the Forest Service extensively used and relied upon the appraisal and data in creating the appraisal summary and technical report for agency officials. As explained by the Forest Service, the technical report is "a comprehensive assessment" of the appraisal that validates "the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data." Scofield Decl. ¶ 40. Naturally, the appraisal summary likewise "incorporated a significant amount of information from the Appraisal." *Id.* ¶ 42. Thus, the Forest Service evaluated "several sections of the Appraisal" and "relied heavily" on it to write the two reports. *Id.* ¶ 39. Indeed, it is unclear how the technical report or the summary could have been created without the underlying appraisal. And both the report and the summary were prepared to assist the Secretary when "making his decision to accept the Appraisal and move forward with the land exchange." *Id.* ¶ 42. This factor strongly favors constructive control because the Forest

Service extensively used and relied on the appraisal to create documents central to its decision whether to approve the land transfer.

The second and fourth factors weigh against constructive control.  Under the second factor, the Forest Service cannot use the appraisal or data as the agency sees fit.  The appraiser keeps the appraisal in a digital vault, Def.'s Smt. ¶ 52, and the Forest Service employee responsible for review cannot print it, screenshot it, forward it, or take similar action to remove it or the information within it from the virtual vault.  *Id.* ¶ 53.  And if the Forest Service employee wants to discuss the appraisal with the appraiser, the employee communicates orally via Microsoft Teams calls only, avoiding any other media (such as email or instant messages) that can be saved and disposed of at will by the Forest Service.  *Id.* ¶ 50, 53.  Under the contract, "information about the assignment, appraisal results, or portions thereof" can be given "only to the Contracting Officer, Forest Service Review Appraiser, or Chief Appraiser."  Gov't Mot. for Summ. J. at 15.  Under the fourth factor, the appraisal has not been imported into the Forest Service's official repository for documents the agency created or retained for the land exchange process.  *See* Scofield Decl. ¶ 30; Def.'s Stmt. ¶¶ 46–47, 54.

Nonetheless, taken together, the Court concludes the weight of the factors demonstrate the Forest Service constructively controls the appraisal.  The agency's contract with the appraiser expressly contemplates relinquishing the appraisal to the agency, and even though it is not in the agency's internal file system and the agency must access it in accordance with the restrictions on the appraiser's digital vault, the Forest Service extensively used and relied on the appraisal to create the two reports that—alongside the appraisal—will form the basis for the Secretary's land

transfer decision.[3]  Accordingly, the appraisal is an "agency record" under FOIA.  *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 149 (D.C. Cir. 2016).

**B.    Exemption 4**

Exemption 4 allows an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  To qualify for Exemption 4, the withheld information therefore must be: (1) "commercial or financial"; (2) "obtained from a person"; and (3) "privileged or confidential."  *Citizens for Responsibility and Ethics in Wash. v. DOJ*, 58 F.4th 1255, 1262 (D.C. Cir. 2023).  Only some of the information the Forest Service withheld satisfies that test.

1.    *"Commercial or financial"*

The terms "commercial" and "financial" in Exemption 4 are "given their ordinary meanings and are construed broadly."  *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 115 (D.D.C. 2012) (cleaned up).  "Exemption 4 is not confined only to records that reveal basic commercial operations or relate to the income-producing aspects of a business."  *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (cleaned up).  Rather, "[t]he exemption reaches more broadly and applies . . . when the provider of the information has a commercial interest in the information submitted to the agency."  *Id.* (cleaned up).  The term reaches "any information in which the submitter has a 'commercial interest, such as business sales statistics, research data,

---

[3] By contrast, the Court concludes the appraiser's documents containing the data underlying the appraisal are not "agency records" because the Forest Service does not constructively control them. Although the work contract similarly contemplates releasing the data documents, *see* Scofield Decl., Ex. 2, at 2, the agency cannot use the data as it sees fit, and the documents have not been integrated into the Forest Service's systems for the same reasons as the appraisal stated above. And, most importantly, the record does not demonstrate the Forest Service employee responsible for reviewing the appraisal actually used or relied on the appraiser's documents containing the underlying data. *See* Scofield Decl. ¶¶ 39–42.  The appraiser's data documents are therefore not agency records.

overhead and operating costs, and financial conditions.'" *COMPTEL*, 910 F. Supp. 2d at 115 (citations omitted). In the end, "the question of whether information is 'commercial' boils down to a commonsense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009).

The information from the appraiser, Resolution, and other third parties that the Forest Service withheld qualifies as "commercial." Representative examples of the withheld information include: geologic and data concerning the nature and extent of the orebody on the exchanged land parcel; the costs associated with the mining process, including the costs of concentration, roasting, and transporting the ore; and projected data on production and recovery of minerals and cash flows from the mining project. Hundley Decl. ¶¶ 18–21, 24–26, 28–29, Dkt. 36-4; *see also* Resolution Mot. for Summ. J., at 6–8, 11–12, Dkt. 36-1; Def.'s Stmt. ¶ 70 (noting information in the report and the summary regarding: "resource classification; deposit size and estimated billions of pounds; zoning use; orebody specific parameters; and project delay information"). The information and data in these categories "reveal basic commercial operations" concerning the proposed mine and "relate to the income-producing aspects of [Resolution's] business."[4] *Public Citizen*, 704 F.2d at 1290. For example, the concentrate transport costs are "operating costs" that relate directly to the "making of a profit." *Citizens for Resp. & Ethics in Wash. v. DOJ*, 728 F. Supp. 3d 113, 121 (D.D.C. 2024). And Resolution's data and cash flow projections—including Resolution's anticipated annual recovery and production of various minerals—included in the appraisal and reports relate "basic business operations and techniques" and are "undoubtedly commercial." *Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 8 (D.D.C. 2021). Similarly, the information

---

[4] The information on orebody characteristics that Resolution obtained through testing, analysis, and exploration also qualifies as protected "research data." Hundley Decl. ¶ 18; *COMPTEL*, 910 F. Supp. 2d at 115.

provided by mineral and mining experts concerns assessments of various mineral deposits and their effects on the real estate market for parcels of land containing those deposits, *see* Scofield Decl. ¶ 48; Def.'s Stmt. ¶ 64, which qualifies as commercial, *see Wilson v. FCC*, No. 21-cv-0895, 2022 WL 4245485, at \*7 (D.D.C. Sept. 15, 2022) (concluding documents concerning "the market value and proposed sale prices for various" assets and information impacting "negotiations and possible structures for" a transaction fit "snugly within the 'ordinary meanings' of the terms 'commercial' and 'financial'") (citing *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

The Center argues that comparable sales data used by the appraiser should be unredacted because "general information" on comparable sales, including their "names, geographic locations, project stages, and land use classifications," is not commercial.  Opp'n at 21.  But Exemption 4 also guards against indirect disclosure of information that can be used to easily deduce exempt information.  *Cf. Naumes v. Dep't of the Army*, 588 F. Supp. 3d 23, 38 (D.D.C. 2022) (noting Exemption 4 can justify withholding portions of documents "'from which information supplied by [the third party] could be extrapolated'") (quoting *Gulf & Western Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979)).  Releasing the names, locations, and other comparable characteristics of similar land parcels would allow competitors to reverse engineer Resolution's projections about the parcel and mining project.[5]  *See* Scofield Decl. ¶ 51

---

[5] The Center argues that the agency refuses to disclose even the number of comparable sales that were analyzed by the appraiser "without providing any argument as to how this number can possibly fit within Exemption 4."  Center Reply, at 10, Dkt. 45.  It appears that the agency did provide certain numbers regarding comparable sales but possibly did not disclose others.  *See* Bosshardt Decl., Ex. A, at 17, Dkt. 36-3 (redacting the full number of "international copper projects" but identifying the "remaining 13 comparable sales" and "four comparable sales").  Accordingly, the agency must review its redactions and either make additional disclosures or provide adequate justification for withholding the number of comparable sales.

Accordingly, the Court concludes that information related to business-related processes, decisions, and conduct are "sufficiently commercial" to be withheld under Exemption 4. *Pub. Citizen v. HHS*, 975 F. Supp. 2d 81, 105 (D.D.C. 2013).

        2.      *"Obtained from a person"*

Exemption 4 requires withheld information to have been "obtained from a person." *CREW*, 58 F.4th at 1262. FOIA broadly defines a "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). "Information is considered 'obtained from a person' . . . so long as the information did not originate within the federal government." *Elec. Priv. Info. Ctr. v. DHS*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (citing *Bd. of Trade of City of Chicago v. CFTC*, 627 F.2d 392, 404 (D.C. Cir. 1980)). And information sought from the federal government may still be considered "obtained from a person" if it summarizes information provided by an external party or is a document "from which information supplied by [the third party] could be extrapolated." *Gulf Western*, 615 F.2d at 529–30. But when an agency analyzes, rather than just summarizes, third-party information, such information will not be considered "obtained from a person." *Philadelphia Newspapers, Inc. v. HHS*, 69 F. Supp. 2d 63, 66–67 (D.D.C. 1999). "[T]he key distinction—which will obviously be blurry in many instances—is between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency, such that it is no longer a 'person's' information but the agency's information." *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012).

The withheld commercial information was "obtained from a person" because: (1) the information came from various non-governmental individuals and entities; and (2) the agency only redacted information that was not substantially reformulated by the agency.

14

First, the withheld information originated with entities outside the federal government. The withheld information came from three sources: the appraiser; Resolution Copper; and mineral and mining experts. Gov't Mot. for Summ. J. at 18 (citing Def.'s Stmt. ¶ 59). Each of these sources fall within FOIA's definition of a "person."[6]  *See* 5 U.S.C. § 551(2) (defining "person" to mean "an individual, partnership, corporation, association, or public or private organization other than an agency").

Second, the agency only redacted information that was not substantially reformulated or analyzed by the agency. Throughout the summary and technical report, the agency repeats and summarizes third-party commercial information and data. *See, e.g.*, Bosshardt Decl., Ex. A at 21–28; Ex. B at 20–27. Those portions of the relevant pages are redacted. *See id.*  At the same time, the Forest Service's analyses of the appraisal's methodologies, as well as the agency's explanation for how it conducted its technical assessment, are unredacted. *See, e.g.*, *id.*, Ex. A at 2–7; Ex. B at 13–14. Thus, the record makes clear that the Forest Service has selectively redacted the documents to disclose nonexempt portions while withholding both commercial information and anything that could be used to easily extrapolate such commercial information. *Compare* Bosshardt Decl., Ex. A at 2–7; Ex. B at 13–14 (leaving unredacted portions related to methodology) *with* Scofield Supp. Decl. ¶ 6, Dkt. 40-3 (cataloging redactions of commercial

---

[6] The Center resists this conclusion by arguing that "'the appraiser acted as a disinterested, expert consultant,'" making him a government actor. Center Opp'n at 22 (citing *Colo. Wild*, 691 F. Supp. 3d at 163). That's incorrect. *Colorado Wild* is inapposite because it applies to Exemption 5, not Exemption 4. 691 F. Supp. 3d at 163, 166 (noting that Exemption 4 might provide separate protections for appraisers). Moreover, the appraiser received the information he relied on from Resolution and the mineral and mining experts, who are indisputably "person[s]" outside the agency. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 71 F.4th 1051, 1057 (D.C. Cir. 2023) (holding "the [agency] permissibly redacted its own comments to avoid disclosing confidential commercial *information* obtained from" an entity outside the government (emphasis added)).

information).  Accordingly, the agency properly redacted third-party commercial information rather than its own analysis.

        3.    *"Privileged or confidential"*

"The term confidential" means "private or secret." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019) (internal quotation marks omitted).  The Supreme Court has described two conditions that might suggest confidentiality.  *Id.*  The first condition is that the information is "customarily kept private, or at least closely held, by the person imparting it."  *Id.* This means that the information is "known only to a limited few," "not publicly disseminated," or "intended to be held in confidence or kept secret."  *Id.* (internal quotation marks omitted).  The second condition is whether "the party receiving [the information] provides some assurance that it will remain secret."  *Id.*  The D.C. Circuit "does not require assurances of privacy as a separate component of confidentiality."  *Naumes*, 588 F. Supp. 3d at 40.  Because both Resolution and Forest Service have demonstrated that the withheld information meets the first condition, the Court need not address the second.

As Resolution's chief financial officer explains, the company treats the information it provided in the appraisal process as highly sensitive and confidential.  *E.g.*, Hundley Decl. ¶¶ 20–29.  Dissemination within the company is often limited to a select few employees, and in many cases the information is shared on a need-to-know basis.  Hundley Decl. ¶¶ 20, 23, 26, 29. "[T]here's no question" that a FOIA intervenor-defendant like Resolution satisfies the confidentiality element when it presents "uncontested testimony" like this that it "customarily do[es] not disclose [the information] . . . or make it publicly available."  *Argus Leader*, 588 U.S. at 434.

As the Forest Service attests, the appraiser kept the appraisal, and all underlying data and information supporting it, secured in an electronic vault to which only one employee at the Forest Service has access. Def.'s Smt. ¶¶ 7, 51. And he labeled the appraisal confidential, so that the information was protected to the full extent under law in accordance with his contract. Gov't Mot. for Summ. J. at 23 (citing Scofield Decl. ¶¶ 47, 7). Indeed, at various points throughout the appraisal, he included additional confidentiality statements. Scofield Decl. ¶ 47. The contract also limited access to the information about the assignment, appraisal results, or portions thereof to only "the Contracting Officer, Forest Service Review Appraiser, or Chief Appraiser." Gov't Mot. for Summ. J. at 15. Accordingly, the appraiser took actions to ensure the information would be known only to a limited few, not publicly disseminated, and intended it to be held in confidence and kept secret.[7]

The Center's counterarguments do not persuade, *see* Opp'n at 28. First, although the contract states that FOIA "may result in the release of all or part of the appraisal report," Scofield Decl. ¶ 7, it also outlines provisions for marking information as "confidential and closely held," *see id.* And the appraiser did in fact mark the entire appraisal as confidential. *Id.* ¶ 47. He also

---

[7] The Center objects to the Forest Service's reliance on the Scofield Declaration as relying on impermissible hearsay. Opp'n at 24–27; *see Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 49 (D.D.C. 2021). But an "agency declarants' testimony based on information obtained in the course of their official duties or from review of agency records is routinely considered when evaluating an agency's invocation of FOIA exemptions." *Id.* at 50 (collecting examples). And Scofield, the Forest Service's Assistant Director for FOIA, also relied "on the basis of [her] own personal knowledge, [her] review of the agency records subject to the FOIA requests at issue in this case, and [her] discussions with my Forest Service colleagues who are likewise familiar with the FOIA requests and agency records at issue in this case." Scofield Decl. ¶ 3. The portions of the declaration relying on those bases are admissible. *Ecological Rts. Found.*, 541 F. Supp. 3d at 48–51. Even excluding the inadmissible hearsay portions of the declaration, it still provides information probative of the agency's Exemption 4 claims, including whether the appraiser closely held the information and treated it as confidential. *See Argus Leader*, 588 U.S. at 434 (explaining the confidentiality analysis turns on how "the person imparting" the information treated it).

reiterated that understanding by placing confidentiality statements throughout the document.  *Id.*
Second, while the contract states that "release of the appraisals to the Forest Service and
[Resolution] will occur only after" the appraisals have been reviewed and approved, Scofield Ex.
1 at 15, it is unclear why releasing these documents to Resolution and the Forest Service would
abrogate the appraiser and Resolution's confidentiality interests in the commercial information.
Third, the land exchange legislation does not "directly contradict[]" any "expectation of more
permanent secrecy" in the commercial information, as the Center suggests, Opp'n at 30.  The
relevant provision of the legislation merely provides that "[b]efore consummating the land
exchange under this section, the Secretary shall make the appraisals of the land to be exchanged
(or a summary thereof) available for public review."  16 U.S.C. § 539p(c)(4)(B)(iv).  A summary
of the appraisal could redact or omit entirely any confidential commercial information.  *See
Electronic Frontier Found. v. DOJ*, 376 F. Supp. 3d 1023, 1029 (N.D. Cal. 2019) (noting separate
document release statute with purpose "to allow for more transparency" did not "override the
ability of the government to claim proper FOIA exemptions" (internal quotation marks omitted)).

     The government and Resolution have also established that it is "reasonably foresee[able]
that disclosure would harm an interest protected by" Exemption 4.  *See* 5 U.S.C. § 552(a)(8)(A).
In the context of Exemption 4, the foreseeable harm requirement is met by showing that disclosure
of the exempted information would "caus[e] genuine harm to the submitter's economic or business
interests."  *CREW*, 2024 WL 1406550, at *7 (citing *Center for Investigative Reporting*, 436 F.
Supp. 3d at 113).  Indeed, the government and Resolution provide explanations why release of the
commercial information would harm Resolution's business interests and competitive standing.
*See, e.g.*, Hundley Decl. ¶¶ 21–30; Hundley Suppl. Decl. ¶¶ 5–13, Dkt. 43-2.

By contrast, the government has not established that it is reasonably foreseeable that disclosure would harm the appraiser and mining and mineral experts' business interests. The portions of the Scofield Declaration discussing potential harms to the appraiser and third-party experts mostly relies on hearsay and double hearsay to support the government's claims. *See* Scofield Decl. ¶¶ 46–55. Courts routinely reject "as impermissible hearsay an agency's invocations of FOIA exceptions reliant on out-of-court statements by private third parties." *Ecological Rts. Found.*, 541 F. Supp. 3d at 48–51 (collecting cases). "Without the accounts of [economic harm to the appraiser or third-party experts], the declaration's justification for withholding the information is reduced to speculation and summary accounts of the hearsay." *Humane Soc'y of United States v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 45 (D.D.C. 2019) (holding government did not meet FOIA exemption requirements when agency relied on hearsay statements from private parties). Because the Forest Service has failed to "demonstrate that the information withheld" due to potential harms to the appraiser and third-party experts "logically falls within the claimed exemption," *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984), the government has not satisfied Exemption 4's foreseeable-harm requirement for these individuals.

In conclusion, the Forest Service has justified some but not all of its Exemption 4 withholdings. The agency has justified withholding information that would result in foreseeable economic harm to Resolution. But at least at this juncture, the agency has not provided sufficient admissible evidence to conclude that it permissibly withheld information that would result in foreseeable harms to the appraiser and third-party experts' business interests. Thus, in addition to reviewing the comparable sales information identified above, *see supra* n.5, the Forest Service must also review its redactions and either make additional disclosures or provide adequate

justification for withholding the number of comparable sales and other information withheld based on potential injuries to the appraiser and third-party experts, *see, e.g., Leopold v. DOJ*, No. 19-cv-3192, 2021 WL 124489, at \*4–7 (D.D.C. Jan. 13, 2021) (government satisfied Exemption 4 foreseeable harm requirement by providing a private third-party declaration explaining anticipated economic harms caused by release of information).

## C.    Exemption 5

Exemption 5 protects from disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant—including . . . the deliberative process privilege." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation marks omitted). To invoke the deliberative process privilege, an agency must show that the information withheld is both "predecisional" and "deliberative." *Id.* at 38 (internal quotation marks omitted). The agency must also show foreseeable harm from disclosure. 5 U.S.C. § 552(a)(8)(A)(i)(I).

### 1.    *"Intra-Agency"*

Exemption 5 protects certain "intra-agency" documents from disclosure. *See* 5 U.S.C. § 552(b)(5). The appraisal summary and technical report were both created by Sanchez, a Forest Service employee, for the agency to use in the land exchange process, so they are "intra-agency" documents. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9–10 (2001) (noting the term generally refers to documents "addressed both to and from employees of a single agency"). Although the outside appraiser prepared the appraisal, he functioned like an employee, and nothing in the record suggests the appraiser represented any interests of any party

other than the Forest Service.  *See Colo. Wild Pub. Lands v. Forest Serv.*, 691 F. Supp. 3d 149, 163 (D.D.C. 2023)

     2.  *Predecisional and Deliberative*

   A document is "predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'"  *Jud. Watch, Inc. v. FDA*, 449 F.3d at 151 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  Four factors guide the Exemption 5 deliberative-process inquiry: (1) what deliberative process is involved; (2) the role played by the disputed documents during that process; (3) the nature of the decision-making authority vested in the person issuing the disputed document; and (4) the relative position in the agency's chain of command of the persons authoring and receiving the document.  *Jud. Watch, Inc. v. DOJ*, 20 F.4th 49, 55 (D.C. Cir. 2021).  All four factors support the conclusion that the appraisal, summary, and technical report are predecisional and deliberative.

   First, the deliberative process involved is the Secretary's ultimate decision whether to approve the appraisal for the parcels in the pending land exchange.  *See* Def.'s Stmt. ¶ 85.  This process easily meets the Supreme Court's definition of "deliberative" communications as those "prepared to help the agency formulate its position" on a policy matter.  *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021).

   Second, the documents play a central role in the deliberative process.  The appraisal is statutorily mandated for the decision-making process, *see* 16 U.S.C. § 539p(c)(4), and the Secretary will rely on it and the related reports when deciding whether to approve the land exchange.  Sanchez authored the technical report and appraisal summary to provide a comprehensive assessment of the appraisal and assist the Secretary in the decision.  *See* Scofield

Decl. ¶ 40; Def.'s Stmt. ¶ 18; *Colo. Wild*, 691 F. Supp. 3d at 157 ("Both the appraisals and the [technical review], which assesses the appraisals for accuracy and completeness, serve an important role in the process by ensuring that the exchanged lands are of approximately equal value, as required under statute.").  Thus, the second factor suggests these documents are both predecisional and deliberative.

The third and fourth factors also indicate the documents are predecisional and deliberative because they were prepared by a consultant and agency employee to assist the Secretary's ongoing decision-making process regarding the land exchange.  *See, e.g.*, *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 364 (D.C. Cir. 2021) (noting the "key to whether a document is deliberative is whether it is part of the give-and-take of the consultative process") (internal quotation marks omitted); *Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional.").

Accordingly, all four factors favor concluding the appraisal, appraisal summary, and technical report are predecisional and deliberative.

### 3.    *Foreseeable Harm*

"[T]he foreseeable harm requirement imposes an independent and meaningful burden on agencies."  *Reps. Comm.*, 3 F.4th at 369 (alterations and internal quotation marks omitted).  To carry this burden, an agency withholding documents under the deliberative process privilege must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward."  *Id*. at 370.  "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely

explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Id.* at 369–70.

The Forest Service claims releasing the information will lead to two harms: (1) public confusion of the agency's position on controversial issues and (2) impaired communications between agency employees and the Tribes.  Gov't Mot. for Summ. J. at 38–39.  The Court is unpersuaded that either harm would adversely impair internal deliberations.

Start with the risk of public confusion.  The agency argues releasing the withheld information "will sow confusion publicly as to whether (1) the Tribal consultation and Final Statement are completed, which they are not and (2) that proposed value is the actual approved value for the parcels of land being exchanged."  *Id.* at 38.  That argument has previously been rejected by courts in this district.  *See Colo. Wild.*, 691 F. Supp. 3d 149.  In *Colorado Wild*, involving a FOIA request for appraisals related to a national forest land exchange, the district court dismissed concerns of public confusion and concluded that "it would be a simple task for the Forest Service to clear up any confusion" by contextualizing the documents to the public.  *Id.*  So too here.  The Forest Service can easily make clear when it releases the redacted versions of the documents—whether through the agency's website, a press release, or another method—that the appraisal has not yet been formally approved by the Secretary.  Similarly, the agency can clarify it has not yet finalized the Environmental Impact Study for NEPA purposes.  *Id.*  ("When such a straightforward explanation will do the trick, the harm requirement . . . forbids an agency from opting to keep the public in the dark.").

The claimed harm to the Tribal consultation process also fails.  The Center provided declarations from the Chairman of the San Carlos Apache Tribe and the Executive Director of the Inter Tribal Association of Arizona, Inc. that contradict the Forest Service's claims regarding the

consultation process. According to the declaration, the San Carlos Apache Tribe wants to begin formal consultation with the Forest Service regarding the proposed copper mine and land exchange, and the Tribe has requested to review the appraisal as part of this process—but the Forest Service has refused. Rambler Decl. ¶ 7, Dkt. 37-7. The Tribe "fundamentally disagrees" that release of the redacted information in the Forest Service's appraisal reports would jeopardize the deliberations of the consultation process and argues release will facilitate the consultation process. *Id.* ¶ 11. Accordingly, the agency's argument that the Tribal consultation process would be derailed by releasing the withheld information is unsupported by the record.

### D.    Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The segregability requirement does not apply to non-exempt material that is "inextricably intertwined" with exempt material, *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977), and agencies are entitled to a presumption that they disclosed all reasonably segregable material, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). Here, Forest Service undertook a line-by-line analysis of the two documents produced in response to the Center's FOIA requests and concluded the agency had released all reasonably segregable, non-exempt material. *See* Scofield Decl. ¶¶ 71–74. But the record shows the Forest Service did not conduct that analysis closely enough.

A review of the appraisal summary and technical report reveals that at various points, the exact same language was redacted from one document but not the other. *Compare, e.g.*, Bosshardt Decl., Ex. A, at 14, *with id.*, Ex. B, at 8 (language in "Improvements" section); *id.*, Ex. A, at 19 *with id.*, Ex. B, at 11 (last sentence in "Mining Method" section). The two reports also

inconsistently assert which exemptions for apparently the same information.  *Compare, e.g.*, *id.* Ex. A, at 20 (claiming the direct sales comparison is exempt under both Exemptions 4 and 5) *with id.* Ex. B, at 12 (claiming the direct sales comparison is exempt under only Exemption 4).  Finally, the redactions are inconsistent within the same document. *Compare*, *e.g., id.*, Ex. A, at 15 (redacting portions of the "Highest and Best Use" section) *with id.*, Ex. A, at 14 (disclosing "the highest and best use of the subject is exploration and development of the . . . mineral resource"); *see also supra* n.5 (comparable sales data).

In sum, the Court cannot conclude that the agency released all reasonably segregable non-exempt portions the appraisal summary and technical report.[8]  Accordingly, the Forest Service must conduct another line-by-line review of the withheld information to ensure that it has released all reasonably segregable non-exempt information, consistent with this Memorandum Opinion.

## CONCLUSION

For the foregoing reasons, defendant Forest Service's Motion for Summary Judgment is granted in part and denied in part, defendant-intervenor Resolution Copper, LLC's Motion for Summary Judgment is granted in part and denied in part, and plaintiff Center for Biological Diversity's cross-motion for summary judgment is granted in part and denied in part.

A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 28, 2024

---

[8] Because the agency has not yet produced the appraisal, the Court cannot conclude at this juncture that it has properly disclosed all reasonably segregable material from that document.